Annabelle Candy Company, Inc. v. Commissioner.
Annabelle Candy Co. v. Commissioner
Docket No. 83535.
United States Tax Court
T.C. Memo 1961-170; 1961 Tax Ct. Memo LEXIS 181; 20 T.C.M. (CCH) 873; T.C.M. (RIA) 61170; June 12, 1961
*181 Business expenses: Compensation v. Dividends: Automobiles purchased for corporate officers. - In 1955, the taxpayer-corporation purchased two automobiles for the personal use of its president and vice-president, who were equal owners of all of the taxpayer's outstanding stock. The Tax Court held that the cost of the automobiles was not deductible as part of the officers' salaries. There was no proof that the automobiles were intended as additional compensation to the officers. Deductions: Depreciation: Agreement not to compete: Burden of proof. - Difficulties arose between the two stockholders of the taxpayer-corporation. The taxpayer entered into a purchase and sale arrangement with one of the stockholders whereby he transferred his entire stock interest to the taxpayer and agreed not to compete for five years. The Tax Court held that no part of the purchase price was allocable to the covenant not to compete which could be amortized over the life of the covenant. Although the covenant not to compete was a significant aspect of the entire transaction, it was inextricably tied to the sale of the stock and was clearly secondary to the sale. Deductions: Legal expenses: Capital expenditure *182 v. business expense: Redemption of stock. - The taxpayer paid its attorneys for legal services rendered in the negotiation and execution of an agreement to purchase the stock of its vice-president. The Tax Court held that the fee was a nondeductible capital expenditure, being a part of the cost to the taxpayer of redeeming stock. There was no evidence that any part of the fee was for services other than those related to the redemption of stock. John F. Taylor, Esq., and Martin J. Dinkelspiel, Esq., 405 Montgomery St., San Francisco, Calif., for the petitioner. Claude R. Wilson, Jr., Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax for the years 1955, 1956, and 1957 in the respective amounts of $8,032.42, $6,536.06, and $3,035.12. The issues are: (1) Is the cost of two automobiles which petitioner purchased in 1955 for the personal use of its president and vice-president (its only shareholders), title to which it retained until the Spring of 1956, deductible by petitioner in 1955? (2) Is any value allocable to the covenant not to compete contained in the agreement of May 15, 1956 between *183 petitioner and Fred Sommers so as to allow petitioner to amortize the cost of the covenant over the life of the covenant? (3) Is the sum of $2,500 or a portion thereof which petitioner paid to its attorneys for handling the negotiations and legal documents incidental to the agreement of May 15, 1956 with Fred Sommers deductible in 1956 by petitioner as a business expense? Findings of Fact Some of the facts have been stipulated and, as stipulated, are incorporated by this reference. Petitioner was incorporated under the laws of the State of California on November 9, 1954 and began doing business in corporate form on January 1, 1955. It filed its income tax returns for the taxable years 1955, 1956, and 1957 with the district director of internal revenue at San Francisco, California. Prior to January 1, 1955, the business of petitioner had been carried on by Sam Altshuler and Fred Sommers as equal partners. Between January 1, 1955 and May 15, 1956, 50 percent of petitioner's outstanding common stock was owned by Altshuler and 50 percent by Sommers. Following incorporation of petitioner, Altshuler served as president and Sommers as vice-president. Both were directors and both *184 actively participated in the conduct of petitioner's business. Petitioner and its predecessor partnership were at all times herein material engaged in the business of manufacturing and selling candy. Virtually the entire volume of petitioner's sales was dependent on one tencent candy bar marketed under the name of "Rocky Road". This name was taken from a type of marshmallow and chocolate candy which was well known in the candy industry and had been sold in bulk form for years in candy stores. The recipe or formula for manufacturing rocky road candy, and the name "Rocky Road", are not subject to protection from competitors by registration in any manner, whether by patent, trademark, or tradename. There are, however, different methods of making rocky road candy which are not generally known or applied throughout the candy industry. Petitioner employed unique production methods in manufacturing its candy bar which were valuable to petitioner, and it marketed its candy bar in a distinctive red wrapper. Both Altshuler and Sommers had full knowledge of petitioner's unique production methods. 1. Deduction of cost of automobiles. At the first meeting of the Board of Directors of petitioner *185 on January 5, 1955, a resolution was adopted and remained in force through May 15, 1956 providing that the president, Sam Altshuler, and the vice-president, Fred Sommers, would each receive the sum of $1,000 per month as salary. In the year 1955 petitioner purchased a Cadillac automobile for the personal use of Altshuler at a cost of $5,337.41 and a Chrysler automobile for the personal use of Sommers at a cost of $4,511.42. These automobiles were in addition to their salary. On or about December 15, 1955, petitioner determined that Altshuler and Sommers should receive legal title to these automobiles, and it transferred title to them during the Spring of 1956. On its 1955 income tax return, petitioner deducted the full cost of the two automobiles as part of its officers' salaries expense. Respondent determined that the cost of the automobiles was not deductible in 1955 since it "represents a dividend distribution". On brief, respondent points to the stipulated fact that title to the automobiles was not transferred to the officer-shareholders until 1956 as an alternative ground for upholding his denial of the deduction of the cost of the automobiles in 1955. The cost of the *186 automobiles was not an ordinary and necessary business expense of petitioner in 1955. 2. Amortization of alleged cost of covenant not to compete. Difficulties arose between Sam Altshuler and Fred Sommers which came to a head in the latter part of 1955. The two men decided they were no longer able to work together, and their personal attorneys began negotiating in December of 1955 about some method of effecting a parting of the ways. While court action to dissolve petitioner was always a possibility, counsel for Altshuler and Sommers mutually agreed that it would be best for their principals and for the business if a purchase and sale arrangement could be agreed upon without court action. Altshuler and Sommers were both interested in buying out the other's interest in petitioner, and lengthy negotiations during the early months of 1956 centered on the questions of who would be the buyer and who would be the seller and what the purchase price would be for the one-half interest in petitioner to be transferred. These questions were finally resolved by execution of an agreement between petitioner and Sommers dated May 15, 1956. By this agreement Sommers agreed, among other things, to *187 transfer to petitioner his entire stock interest in petitioner, to retire from active participation in petitioner as an officer and director, and not to compete or engage in any activities which might be prejudicial to the business of petitioner for a period of five years. The agreement provided for a total consideration of $115,000 to be paid in installments to Sommers by petitioner. The restrictive covenants which Sommers agreed to were as follows: (b) For a period of five (5) years from date hereof not to: (1) Initiate, organize or be a part of a candy business as an employee, consultant or otherwise, within a radius allowed by law, dating from the execution of an agreement signed by said principals. (2) Manufacture, sell or in any manner distribute or cause to be manufactured, sold or in any manner distributed, any marshmallow bar, and/or to enjoy any gain therefrom. (3) Manufacture, sell, or in any manner distribute or cause to be manufactured, sold or in any manner distributed, or to enjoy any gain therefrom, of any candy, particularly a candy bar that would be described, designated or in any manner be projected or known as "Rocky Road" or by any one of those two words *188 alone, or in combination with another word or other words. (4) Reveal, or in any manner disclose to anyone in the candy business, or to any other person, the formula, contents or processes that enter into and are a part of the composition of the candy manufactured in any form or size and sold as "Rocky Road" by the Annabelle Candy Co. Inc.
(5) Use any red wrapper on any candy bar he may manufacture, sell or in any manner distribute or cause to be manufactured, sold or in any manner distributed, or to enjoy any gain therefrom. (6) Persuade, encourage or suggest, directly or indirectly to any employee of the Annabelle Candy Co. Inc., during the life of this contract between the principals, that he or she leave the employment of said Annabelle Candy Co. or to reveal any of the operations of the said Annabelle Candy Co.
These covenants were first discussed by the parties and their counsel after the purchase price of $115,000 for the stock interest had been preliminarily agreed upon and when safeguards for the buyer and security for the seller were then considered. The agreement of May 15, 1956 made no allocation of any portion of the total consideration of $115,000 to the restrictive *189 covenants. Prior to May 15, 1956, there were no discussions between Altshuler and Sommers or their respective attorneys concerning the subject of an allocation of the purchase price to be made to the covenant not to compete. Petitioner's dollar allocation to the covenant not to compete was made subsequent to May 15, 1956 without the knowledge or consent of Sommers. Petitioner's earned surplus amounted to $40,082.05 on May 15, 1956. By statute in California, a corporation may redeem its stock only out of earned surplus. California Corporations Code §§ 1705-1708. Neither petitioner's representatives nor Sommers and his counsel were aware of the possible applicability of these sections of the law of the State of California when they negotiated and signed their agreement of May 15, 1956. In a statement included with its 1956 income tax return, petitioner allocated $80,554.67 of the $115,000 purchase price under the agreement of May 15, 1956 to the covenant not to compete contained therein and began the amortization of the value so allocated over the covenant's five-year life at a rate of $16,110.93 per year. For the calendar year 1956, petitioner began the amortization as of May 15, 1956, the *190 date of the agreement with Sommers, and took 15/24 of the annual rate of $16,110.93 or $10,069.33 as its amortization deduction. On its 1957 income tax return, petitioner claimed the full $16,110.93 amortization deduction. The respondent determined that the entire consideration in the agreement of May 15, 1956 was paid for the stock interest of Sommers, that no portion thereof was allocated to the covenant not to compete, and that therefore petitioner was not entitled to an amortization deduction in 1956 or 1957. On November 25, 1959, petitioner began an action against Fred Sommers in the Superior Court of the State of California in and for the City and County of San Francisco based in part on the agreement of May 15, 1956 and requesting recovery of all monies paid under that agreement with interest. Petitioner's complaint alleges that "on or about May 15, 1956, in the City and County of San Francisco, plaintiff and defendant entered into a written agreement for the purchase by plaintiff of said capital stock from defendant for the sum of $115,000.00 * * *". Petitioner brought this action against Sommers, taking an inconsistent position from that taken in the instant case, as a protective *191 suit in case its position regarding the covenant not to compete should not be sustained by this Court. No separate or severable consideration was bargained for or paid for the covenant not to compete contained in the agreement of May 15, 1956. 3. Deduction of legal expenses. In consideration of the legal services rendered between December 27, 1955 and May 31, 1956 pertaining to the negotiation and execution of the agreement of May 15, 1956, petitioner paid its attorneys, Dinkelspiel & Dinkelspiel, the sum of $2,500 in the year 1956. On its 1956 income tax return, petitioner deducted this $2,500 as part of its legal fees expense. Respondent disallowed the deduction and determined that the entire amount was a nondeductible capital expenditure. At the hearing of this case and on brief, petitioner conceded that the entire $2,500 amount was not properly deductible. It now contends at least part of this fee is deductible by it as a business expense. The $2,500 legal fee was paid by petitioner for services rendered in connection with petitioner's redemption of a portion of its stock. It was a capital expenditure. Opinion RAUM, Judge: 1. Deduction of cost of automobiles. Whether *192 the cost of the automobiles which petitioner purchased in 1955 for the personal use of its officers and only shareholders, Sam Altshuler and Fred Sommers, is a deductible salary bonus as claimed by petitioner or a nondeductible dividend as determined by respondent is a question of fact to be decided on the evidence presented. The burden of proof was on the petitioner to establish that the cost of these two automobiles was an ordinary and necessary business expense of the corporation in 1955. Petitioner has not met this burden. The evidence fails to show that the petitioner purchased or transferred title to these automobiles with the intent of thereby paying its officers added compensation. The record indicates only that Altshuler and Sommers wanted and needed new automobiles and that they had the petitioner purchase them in 1955 for their use. The mere fact of purchase, especially since Altshuler and Sommers were the only shareholders at this time, is as consistent with respondent's dividend theory as petitioner's bonus theory. Proof is lacking of any intent to compensate the officers beyond their monthly salary of $1,000. Even had the petitioner successfully shown that the automobiles *193 were intended as salary bonuses to Altshuler and Sommers, it was stipulated that petitioner retained title to the automobiles until the spring of 1956, thereby leaving in serious doubt the question whether a deduction would in any event be proper for 1955. However, we do not pass upon this question because it is clear to us that no right to deduction has been shown in this connection regardless of the year in which it might be claimed. 2. Amortization of alleged cost of covenant not to compete. At the hearing of this case the Court indicated its tentative conclusion based on the evidence presented that no separate or severable consideration was in fact bargained for or paid for the covenant not to compete contained in the agreement of May 15, 1956. After carefully reviewing the record and the briefs submitted by counsel, our conclusion remains unchanged. The evidence indicates that Fred Sommers' covenant not to compete with petitioner, while a significant aspect of the entire transaction, was inextricably tied to the sale of Sommers' stock and was clearly secondary to such sale. There is no convincing proof that "the parties * * * treated the covenant in a separate and distinct manner *194 with respect to value and cost so that a severable consideration for it can be shown * * *." United Finance & Thrift Corporation of Tulsa, 31 T.C. 278, 285, affirmed 282 F. 2d 919 (C.A. 4), certiorari denied 366 U.S. 902 (April 24, 1961). On the contrary, we have found as a fact that the purchase price of $115,000 for the stock interest had been preliminarily agreed upon before the covenant was first discussed as an additional safeguard for the prospective buyer. Nor is there any proof on this record that Califorina law, which prohibited petitioner from purchasing its stock except out of earned surplus and which conceivably could have served as a basis for an allocation of the purchase price, in fact played any part in the negotiation of the agreement of May 15, 1956. Thus, we were unable to find as petitioner contends that it was the intent of the agreement of May 15, 1956 that a portion of the $115,000 which petitioner agreed therein to pay Sommers was in consideration for Sommers' promise not to compete in the candy business. We hold that respondent correctly determined that petitioner is not entitled to an amortization deduction in 1956 *195 and 1957 for the covenant not to compete. Cf. George H. Payne, 22 T.C. 526; Harold J. Burke, 18 T.C. 77; Aaron Michaels, 12 T.C. 17. 3. Deduction of legal fees. Respondent disallowed the deduction by petitioner on its 1956 income tax return of the $2,500 which petitioner paid its attorneys in 1956 for legal services rendered between December 27, 1955 and May 31, 1956 pertaining to the negotiation and execution of the agreement of May 15, 1956. Respondent determined that these fees were nondeductible capital expenditures, being a part of the cost to petitioner of redeeming the stock interest of Fred Sommers. Petitioner now concedes that the entire amount of $2,500 which it paid its attorneys is not deductible. It argues, however, that a part of its attorneys' services was devoted to efforts to avoid the dissolution of the corporation and to devise various plans which were discussed prior to the adoption of the redemption plan, and that at least the portion of the total fee which is applicable to these separate services in its behalf is properly deductible. We think respondent correctly determined the entire $2,500 fee was capital expenditure. *196 According to the stipulation of facts and the statement sent by petitioner's attorneys to petitioner billing it for the fees in issue (a copy of which was introduced in evidence), the services involved were all related to the agreement of May 15, 1956. Since that agreement provided for a capital expenditure - the purchase by petitioner of shares of its stock - the related legal expenses should have been treated as part of the total capital expenditure, i.e., as part of the cost of the stock purchased. Atzingen-Whitehouse Dairy, Inc., 36 T.C. - (No. 17, April 27, 1961). Petitioner apparently admits that the legal expenses related to the redemption agreement are nondeductible capital expenditures. Thus, petitioner has conceded that the entire $2,500 fee was not deductible. But petitioner contends the fee also covered legal services rendered prior to and apart from the redemption agreement which are deductible. There is no convincing proof in the record of such other legal services in petitioner's behalf and, as already noted, the bill furnished by petitioner's attorneys referred to no such unrelated services. Had petitioner proved that such other services were actually rendered and *197 that the single $2,500 fee was intended to cover them as well as the services rendered in connection with the agreement of May 15, 1956, an allocation of the total fee between the deductible and the nondeductible portions might have been possible. [1] Cf. Waldheim & Co., 25 T.C. 594, 599; Adam, Meldrum & Anderson Co., 19 T.C. 1130, 1145-1146. But, as previously indicated, there is no basis on the present record for any such allocation. It is apparent that petitioner was billed for this $2,500 fee and paid it on the assumption that the entire fee was for services rendered in connection with the redemption agreement of May 15, 1956. As such, the payment of this fee was a nondeductible capital expenditure. *198 Decision will be entered for the respondent. Footnotes
1. However, it should be remembered that there was a dispute between Sommers and Altshuler prior to the May 15, 1956 agreement, and the evidence shows that petitioner's attorneys were also Altshuler's attorneys. Accordingly, any services rendered by the attorneys on Altshuler's behalf could not furnish the proper basis for a deduction by the corporation. Therefore, even if any such services were intended to be covered by the attorneys' bill, contrary to its terms, there would still not be any basis for a deduction here notwithstanding the possibility of making an allocation. For, to the extent that the corporation paid legal fees for services rendered to Altshuler they would not be deductible by it.↩