Ben Lichtman and Ruth Lichtman, et al. [1] v. Commissioner. Lichtman v. Commissioner
Docket Nos. 4069-63, 4070-63, 4071-63. .
United States Tax Court
T.C. Memo 1964-287; 1964 Tax Ct. Memo LEXIS 52; 23 T.C.M. (CCH) 1745; T.C.M. (RIA) 64287; November 2, 1964
*52 Victor S. Leanza, Citizens Bldg., Cleveland, Ohio, for the petitioners. Gordon B. Cutler, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies in petitioners' income taxes for the years 1958: Docket No.
Petitioners
Deficiency
4069-63
Ben and Ruth Lichtman
$1,794.82
4070-63
Alex and Charlotte Licht-
man
1,925.90
4071-63
Morris and Tillie Licht-
man
1,872.33
The principal issue for decision is whether the amount of $35,000 received by the petitioners Ben, Alex and Morris Lichtman constituted payment for the sale of the goodwill of their wholesale laundry business, taxable as long-term capital gains, or payment for an agreement not to compete with the purchaser of their wholesale laundry business, taxable as ordinary income. A secondary issue is whether respondent erred in determining the fair market value of three $5,000 promissory notes received in 1958 as partial payment for the sale at $4,500, $4,000 and $3,500, respectively. As stipulated by the parties in Docket No. 4070-63, the correct medical expense deduction can be given effect in the Rule 50 *53 computation. Findings of Fact Some of the facts have been stipulated and are hereby found accordingly. Petitioners Ben and Ruth Lichtman are husband and wife, residing in University Heights, Ohio. Petitioners Alex and Charlotte Lichtman are husband and wife, residing in Cleveland, Ohio. Petitioners Morris and Tillie Lichtman are husband and wife, residing in Cleveland Heights, Ohio. They all filed joint Federal income tax returns for the taxable year 1958 with the district director of internal revenue at Cleveland, Ohio. Ben, Alex, and Morris are brothers. Since the wife of each is a party to this proceeding only because she and her husband filed joint income tax returns for the years in issue, only the brothers will be referred to hereafter as the petitioners. Since 1933 petitioners have been successfully engaged in the general dry cleaning and laundry business. In 1939 they opened a retail outlet known as The East End Dry Cleaners and Dyers. Under the name Park Avenue Cleaners, several additional stores were opened in 1949. Petitioners incorporated a third dry cleaning business in April 1954 called Checker Cleaners. It owns and operates a central dry cleaning and laundry *54 plant that services its own retail dry cleaning and laundry stores, as well as the Park Avenue Cleaners retail stores. All three businesses operate in the greater Cleveland area. On April 2, 1945, petitioners acquired a wholesale dry cleaning business by purchasing all the outstanding stock of the Dependable Cleaning Company, an Ohio corporation. This firm had been engaged exclusively in furnishing wholesale dry cleaning services since its incorporation in 1924. A wholesale operation in the dry cleaning industry is devoted to servicing independently owned retail outlets that accept dry cleaning from their customers and then send the work out to be done by those with proper facilities. From 1945 through 1958 Dependable engaged in wholesale dry cleaning. It used its own equipment and trucks with commissioned drivers for pickup and delivery to its various retail outlet customers. In addition, "bobtail" drivers were serviced. A "bobtail" is an independent driver with his own route and customers who uses whatever wholesaler he chooses. The introduction of synthetic dry cleaning machines and self-operating coin units in the early 1950's led to a rapid decline in the wholesale dry *55 cleaning industry. In 1955 petitioners decided to find a buyer for Dependable and thereafter concentrate their efforts exclusively in the retail phase of the business. Several offers were explored during the next 3 years. Early in 1958 petitioners began negotiating with Sidney G. Paston who was already engaged in the wholesale dry cleaning business and who desired to buy up competitors so as to maintain his position in the Cleveland area. On October 14, 1958, petitioners delivered a proposed sales agreement to Paston's attorney. It provided for payment of $40,000 to Dependable Cleaners as follows: $25,000 in cash within a week of execution and the balance in three $5,000 notes payable one, two, and three years from the date of execution respectively. The notes were to be unsecured and carry an interest date of 4 percent. For this consideration Paston was to receive the following items: (1) two delivery trucks, (2) Dependable's rights under the existing labor union contract, (3) customer lists (except for department store and "bobtail" accounts), (4) the name "Dependable Cleaners," (5) assurance that the seller would liquidate,(6) a 5 percent commission on all current accounts receivable *56 actually collected and turned over to the seller. The proposed draft of a covenant not to compete entitled "Supplemental Agreement" was added at the end of the contract. No specific value was assigned to it. After examining the proposed contract, Paston and his attorney submitted an alternative proposal which was accepted by the petitioners and formally executed on October 17, 1958. It identified the parties to the contract as follows: THIS AGREEMENT made and entered into at Cleveland, Ohio, this 17th day of October, 1958, by and between THE DEPENDABLE CLEANING COMPANY, an Ohio corporation, hereinafter referred to as "Dependable", BEN LICHTMAN, ALEX LICHTMAN and MORRIS LICHTMAN, hereinafter referred to as "Lichtman", and SIDNEY G. PASTON, doing business as "Excelsior Cleaners", hereinafter referred to as "Paston"; The same purchase price and transfer of items by Dependable were provided for as in petitioners' proposed agreement, but the purchase price was allocated to specific assets. $35,000 was established as the price of the covenant, $1,000 was allocated to the two delivery trucks, and the remaining $4,000 was applied to the other assets transferred. In addition, the covenant *57 was incorporated directly into the contract. It provided that: In consideration of the sum of Thirty-five Thousand Dollars ($35,000.00), which sum is to be paid by Paston to Dependable as set forth below, Lichtman agree individually, jointly and/or severally, as follows: 1. That they will not for a period of five (5) years, after date hereof, enter into and/or engage in a wholesale dry cleaning operation in the counties of Cuyahoga, Lorain, Lake and/or Summit, directly or indirectly, as employee, manager, employer, owner, operator, partner, stockholder, director or officer of an organizational life whatsoever, except as to servicing department stores, "Bobtail" customers, and except as otherwise may be specifically permitted herein. 2. That they will not for a period of fifteen (15) years, after date hereof, directly or indirectly, as employee, manager, employer, owner, operator, partner, stockholder, director or officer of any organizational life whatsoever, of a wholesale dry cleaning operation, solicit or resolicit, compete for, acquire or interfere with any retail dry cleaning customer of Paston's except department stores, "Bobtail" customers, and except as may otherwise *58 be specifically permitted herein. In the absence of this covenant not to compete Paston would not have consummated the transaction. The Sales Agreement of October 17, 1958, was fully performed by the parties thereto. In November 1958, Dependable discontinued business and on December 11, 1958, filed its Certificate of Corporate Dissolution with the Ohio Secretary of State, paid its creditors, sold certain of its plant and office equipment to Checker Cleaners, and distributed its remaining assets to petitioners. Upon distribution of Dependable's assets pursuant to the plan of liquidation, each of the petitioners received one of the Paston notes, and these were included at face value in their income tax returns for 1958. Petitioners reported the total payments they received for the covenant as long-term capital gains. In 1959 petitioners attempted to sell the notes to the Central National Bank. The bank would not buy them. It was not furnished with a statement of Paston's financial position. Petitioners did not have such a statement themselves. The notes were ultimately paid as they matured. Ultimate Findings 1. The covenant not to compete was severable from the goodwill *59 and other assets transferred, and resulted from arm's length negotiations. Petitioners received ordinary income from its sale. 2. The three unsecured promissory notes received as partial payment for the covenant were correctly valued by respondent at $4,500, $4,000 and $3,500, respectively. Opinion Petitioners first contend that payment for their covenant not to compete cannot be taxable to them as ordinary income because it was a liquidating distribution under section 331 (a), [2] Internal Revenue Code of 1954. Although petitioners did receive payment for the covenant during the time of Dependable's liquidation, it was not received as a liquidating dividend because the sale involved the Lichtman brothers individually as well as the corporation. Each petitioner is designated in the opening paragraph of the contract and by the signatures as principal parties. The contract shows that Paston bought the business owned by Dependable Cleaners Company and, in addition, a covenant not to compete owned by the petitioners. Dependable had no interest or ownership in this covenant, and there is no evidence to show that it held any legal claim to receive or control the *60 personal services of the petitioners subsequent to October 1958. Petitioners incorporated the sale of their personal covenant into the sales agreement covering Dependable's transfer of its business to Paston. Consequently, the money Dependable received for the covenant was income taxable to petitioners. The sales agreement of October 17, 1958, was the result of extensive arm's length negotiations between the petitioners and Paston. All were represented by well qualified, tax-conscious counsel when the contract was drafted. No showing has been made that the petitioners entered into the agreement as a result of mistakes, duress, fraud or misrepresentation. The facts establish that the parties voluntarily signed the sales agreement after bona fide and substantial negotiations, and that the provisions contained in the agreement relating to the covenant were express, unambiguous and deliberate. We can only conclude, therefore, that the contract *61 is an accurate expression of what the parties intended. Regardless of the reasonableness of the allocation of purchase price between the covenant not to compete and the other assets, it is evident that our acceptance of petitioners' present objections would require us to disregard the existing agreement. As we have already indicated, it is our view that the agreement entered into by the petitioners was made at arm's length. Having made this determination, we are not inclined to ignore the contract and create a new one. We have refused to do so in the past. Hamlin's Trust v. Commissioner, 209 F. 2d 761 (C.A. 10, 1954), affirming 19 T.C. 718 (1953); Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957); and Emmette L. Barran, 39 T.C. 515 (1962), affd. 334 F. 2d 58 (C.A. 5, 1964). See also Rogers v. United States, 290 F. 2d 501 (C.A. 9, 1961). Petitioners argue that the covenant in this case is so closely connected with the goodwill, trade name and customers lists sold that it is "nonseverable," citing our decisions in Toledo Newspaper Company, 2 T.C. 794 (1943), *62 and Aaron Michaels, 12 T.C. 17 (1949). The severability doctrine [3] has been stated by this Court in Rodney B. Horton, 13 T.C. 143 (1949), as follows: It is well settled that if, in an agreement of the kind which we have here, the covenant not to compete can be segregated in order to be assured that a separate item has actually been dealt with, then so much as is paid for the covenent not to compete is ordinary income and not income from the sale of a capital asset. Estate of Mildred K. Hyde, 42 B.T.A. 738. On the other hand, where the covenant not to compete accompanies the transfer of good will in the sale of a going concern and it is apparent that the covenant not to compete has the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which has been acquired, the covenant is regarded as nonseverable and as being in effect a contributing element of the assets transferred. Toledo Newspaper Co., 2 T.C. 794; Toledo Blade Co., 11 T.C. 1079; Aaron Michaels, supra.
*63 Here the covenant was separately bargained for and dealt with in the agreement. The fact that the parties agreed on a total sales price before allocating a portion to the covenant does not mean the covenant has no value. Annabelle Candy Co., supra. The wholesale dry cleaning business in the Cleveland area was a dying industry in which Paston desired to survive. To accomplish this it was necessary for him not only to acquire petitioners' customer lists, but also to eliminate petitioners from the market. The covenant thus was not merely"assuring to the purchaser the beneficial enjoyment of the goodwill." It assured freedom from petitioners' competition for a substantial period of time. Under these circumstances we think respondent has established a severable covenant. Fred Montesi, 40 T.C. 511 (1963), on appeal (C.A. 6, Nov. 14, 1963); Howard Mathews v. Commissioner, 311 F. 2d 795 (C.A. 3, 1963) affirming per curiam a Memorandum Opinion of this Court. On the second issue, petitioners contend that respondent erred in valuing the three $5,000 notes received in partial payment for the covenant at $4,500, $4,000 and $3,500, respectively. They maintain that *64 the fair market values are $1,000, $500 and $250. In an effort to establish these asserted valuations, petitioners offered the testimony of a banker who said the notes were worth no more than the amounts suggested by the petitioners. The fair market value of unsecured promissory notes depends almost completely upon the financial position of the maker. The banker's testimony was greatly weakened by the fact that he had no financial statement upon which to base his valuation. Consequently, he had no way of knowing Paston's financial ability to pay the obligations as they came due. Since no other evidence was offered to support the banker's testimony, we are unable to make any independent calculation of our own. Respondent's determination is presumptively correct and the petitioners have the burden of disproving it with sufficient evidence to support their contentions. This they failed to do. On the record before us the petitioners failed to establish any reasonable values for the three promissory notes different from the values determined by the respondent, and they have not provided the Court with sufficient evidence upon which it can make its own valuation. Accordingly, respondent's *65 determination stands. Decisions will be entered under Rule 50. Footnotes
1. The proceedings of the following petitioners are consolidated herewith: Alex and Charlotte Lichtman, Docket No. 4070-63 and Morris and Tillie Lichtman, Docket No. 4071-63.↩
2. SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS. (a) General Rule - (1) Complete Liquidations - Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.↩
3. This doctrine as a rationale for deciding cases involving covenants not to compete has recently been criticized by the Court of Appeals for the Tenth Circuit. In affirming two decisions of this Court, Ray H. Schulz, 34 T.C. 235 (1960); Annabelle Candy Co., 20 T.C.M., 873 (1961), the Court of Appeals rejected the severability rule in these words: "The determination of whether or not the covenant is 'severable' or 'nonseverable' has no probative value in determining whether or not it should be considered as a surrender of income - and hence a covenant - or a component of the business which was sold - and hence part of the assets." Schulz v. Commissioner, 294 F. 2d 52, 56 (C.A. 9, 1961). In Annabelle Candy Co. v. Commissioner, 314 F. 2d 1↩ (C.A. 10, 1962), the Court cited the Schulz decision with approval and went on to explain its opposition to the severability rule. The Court felt that the only factual issue to be determined was whether the parties intended to allocate a part of the purchase price to the covenant. If they did, an arm's length transaction existed and the question of severability became immaterial.