**HAMLIN'S TRUST**

v.

**COMMISSIONER OF INTERNAL
REVENUE.**

**NOWELS' ESTATE**

v.

**COMMISSIONER OF INTERNAL
REVENUE.**

**Nos. 4707, 4708.**

United States Court of Appeals,
Tenth Circuit.

Feb. 1, 1954.

Rehearing Denied March 8, 1954.

762

Claude M. Maer, Jr., and John L. J. Hart, Denver, Colo. (Stephen H. Hart and William P. Cantwell, Denver, Colo., on the brief), for petitioners.

S. Dee Hanson, Sp. Asst. to Atty. Gen., H. Brian Holland, Asst. Atty. Gen. (Ellis N. Slack and A. F. Prescott, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

These are petitions to review decisions of the Tax Court. In their tax returns for the year 1946, the trustees of the Clarence Clark Hamlin Trust, and T. E. Nowels and wife Bertie M. Nowels, treated all of the revenue which they received from R. C. Hoiles and his associates as revenue derived from the sale of capital assets. The Commissioner of Internal Revenue disagreed with that treatment of such revenue and resulting deficiencies were imposed. On redetermination, the Tax Court found and determined among other things that of each $200 received from Hoiles and his associates $150 was in payment for capital stock and was taxable as revenue derived from the sale of capital assets while the remaining $50 represented consideration for a covenant not to engage in business in competition with Hoiles and was taxable as ordinary income.

And having made that finding, the court sustained the action of the Commissioner, 19 T.C. 718. The trustees of the Hamlin Trust, the executors of the estate of T. E. Nowels, then deceased, and Bertie M. Nowels, seasonably brought the proceedings here on petitions to review.

The evidence as a whole disclosed these facts. Gazette and Telegraph Company, a corporation, owned a plant and published a newspaper in Colorado Springs, Colorado. The corporation had issued and outstanding 5,000 shares of capital stock, each of the par value of $100. The names of the stockholders and the number of shares owned by them respectively were, El Pomar Investment Company 1248, Clarence Clark Hamlin Trust 1146, T. E. Nowels 950, Charles L. Tutt 703, John A. Carruthers 254, Marguerite Ross 156, Grace C. Foster and Helen Francis Foster 104, Richard W. Nowels 100, Frank R. Wadell 100, Seddie G. Hamlin 100, Mae A. Carruthers 77, James R. Miller 60, and Elizabeth H. Hylbom 2. T. E. Nowels was president of the corporation and editor of the paper. He was an experienced newspaper publisher and was widely known in Colorado Springs. While he was about seventy years of age, he was in good health and had no intention of retiring. Frank R. Wadell was managing editor of the newspaper. Richard W. Nowels, son of T. E. Nowels, was employed on the newspaper. Charles L. Tutt was a man of wealth and had various financial interests, including an interest in El Pomar Investment Company. John A. Carruthers was a lawyer and had various financial interests. Tutt and Carruthers were associated closely together in some of their interests. R. C. Hoiles resided in California, and he was a man of long and varied experience in the newspaper business. Beginning in the fall of 1945, a series of letters passed between Hoiles and Nowels in regard ᴊ Hoiles acquiring the newspaper at Colorado Springs. Hoiles offered $750,000 for all of the outstanding stock of the corporation. Nowels rejected the offer and said that he and other stockholders thought their en-

tire setup was worth not less than $1,-000,000. After obtaining additional information, Hoiles wrote Nowels offering to pay $1,000,000 for all of the stock of the corporation and an agreement on the part of the stockholders not to enter the newspaper business in that area for the next ten years. Nowels replied that the offer would be given immediate and serious consideration. In the letter he further said that it would be hard for him to make a decision since he would be selling not only his stock but also his job. Hoiles wrote Nowels in reply that in the event he should buy the property he would be glad to have Nowels remain with the paper for two or three years as counselor and advisor, and that for such service he would be willing to pay Nowels on the basis of five per cent of the profits before taxes. And it was further said in the letter that Hoiles and his associates would want part of the price for the stock to be a restraining contract so that it could be set up in a new corporation on an amortized basis and thus reduce their taxes. As letters were received from Hoiles, Nowels promptly submitted them to Tutt and Carruthers. Similarly, as letters were written to Hoiles, Nowels submitted copies of them to Tutt and Carruthers. Tutt and Carruthers were familiar with developments as they occurred. Hoiles and his two sons came to Colorado Springs to consummate the purchase. Shortly after their arrival, Nowels accepted for one year the offer to remain with the paper in consideration of five per cent of the net profits before taxes, and the agreement was carried out. After Hoiles and his sons arrived in Colorado Springs, Carruthers prepared a proposed written contract in accordance with his understanding of the agreement negotiated by Nowels and Hoiles. In the proposed contract, Hoiles and his two sons were designated as parties of the first part, and the thereto subscribing owners of stock were designated as parties of the second part. The contract provided that the parties of the first part agreed to pay each of the parties of the second part $200 per share for each share set opposite their names respectively of the stock in the corporation. And it further provided in a separate paragraph that the parties of the second part and each of them agreed as part of the consideration thereof that they and each of them would not engage in the newspaper publication or distribution business in competition with the parties of the first part, or their successors and assigns, in the county in which Colorado Springs was situated for a period of ten years from and after the date of the contract. On the day following the draft of the proposed contract, Nowels, his son Richard, Tutt, and Carruthers met with Hoiles and his sons for the purpose of consummating the transaction. At the conference, Hoiles stated that the contract as prepared by Carruthers was satisfactory, but he inquired whether the sellers would have any objection to putting in the contract a provision that the stock be evaluated at $150 per share and the restraining order at $50 per share. He stated in substance that the purpose of the suggested provision was to make such provision for non-competition enforceable and to help him and his associates tax-wise. With very little discussion, the stockholders present agreed to the suggested provision because they thought it would make no difference to them. Thereupon, Hoiles dictated a new or additional paragraph and it was included in the proposed contract. It provided that the parties agreed that the two items of sale were evaluated (a) the stock at $150 per share, and (b) the prohibition and refraining from carrying on business at $50. As thus amended, the contract was signed by the Hamlin Trust, Nowels, Tutt, Carruthers, and other owners of stock. All of the stock was transferred; the $1,000,000 was paid; and the transaction was completed.

■ The taxpayers challenge the finding of the Tax Court that of each $200 which Hoiles paid to the stockholders of the Gazette and Telegraph Company, $150 was for stock and $50 was for the covenant not to enter the newspaper business in the Colorado Springs area. It is

argued that one member of the Tax Court presided at the hearing and observed the witnesses while testifying; that another member prepared the findings of fact and wrote the opinion of the court in which a majority of the court concurred; that the member who presided at the hearing dissented on the ground that the entire sum paid was for the stock; that in these circumstances the critical finding that of each $200 paid, $150 was for stock and $50 was for the covenant is greatly weakened; and that it should not stand. It is not urged that it was reversible error for one member of the court to conduct the hearing and another member to write the findings of fact and the opinion. The substance of the argument is that the findings of the member of the court who conducted the hearing are entitled to greater weight than are the findings of the other members who did not observe the witnesses and hear their testimony. There is no express requirement in law that the member of the Tax Court who presided at the hearing and observed the witnesses while testifying shall make the findings of fact and write the opinion of the court, and it is not reversible error for one member to conduct the hearing and another member to prepare the findings of fact and write the opinion. Halle v. Commissioner, 2 Cir., 175 F.2d 500, certiorari denied, 338 U.S. 949, 70 S.Ct. 485, 94 L.Ed. 586. Manifestly, where the case turns upon a controverted issue of fact concerning which there is a conflict in the oral testimony, the member of the court who observed the witnesses while testifying and thus had an opportunity to appraise their credibility and determine the weight to be given to their testimony is in a better position than are other members of the court to resolve the conflict or conflicts and reach the correct determination of the ultimate fact or facts. But these generalizations are not controlling here for the reason that there was little or no substantial conflict in the evidence relating to the decisive question of fact.

■ The finding of the Tax Court that of each $200 which Hoiles and his associates paid to the taxpayers and other stockholders of the publishing company, $150 was for stock and $50 was for the covenant not to enter the newspaper business is attacked on the ground that it is not supported by evidence. It is argued in support of the contention that the basic transaction never involved any agreement in respect to the relative value of the stock and the covenant; that in reality the entire sum was paid for stock and a covenant without any separate statement of value for the covenant; that the only reason for the separate statement of value was to reduce the taxes of Hoiles and his associates; and that therefore the entire sum received from Hoiles was subject to tax as revenue derived from the sale of capital assets. It is well settled that the incidence of taxation depends upon the substance of a transaction; that tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title; and that the Government may look at the realities of a transaction and determine its tax consequences despite the form or fiction with which it was clothed. Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406; Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Jones v. Grinnell, 10 Cir., 179 F.2d 873.

■ Hoiles made it clear in the correspondence with Nowels that in the event he and his associates should purchase the stock they would want a covenant on the part of the stockholders not to enter the newspaper business in the Colorado Springs area. At the conference convened for the purpose of consummating the transaction, the parties present agreed verbally that the money paid should be allocated to the sale and purchase of stock and an agreement not to re-enter the newspaper business, the basis of the allocation being $150 for each share of stock and $50 for the covenant.

After reaching that verbal agreement, the written contract was revised accordingly. And the added provision inserted in the contract was free from doubt or ambiguity. Nowels was a party to the verbal agreement, and he signed the written contract; and the written contract was signed by the Hamlin Trust and other owners of stock. It is true that there was very little discussion of the suggested allocation. But the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it. The proposed change in the contract was clear. All parties participating in the conference agreed to it. The owners of stock present signed the written contract at the time and others signed it later. It is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision, but where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. While acting at arm's length and understandingly, the taxpayers agreed without condition or qualification that the money received should be on the basis of $150 per share for the stock and $50 per share for the agreement not to compete. Having thus agreed, the taxpayers are not at liberty to say that such was not the substance and reality of the transaction. Cf. Clover v. Commissioner, 9 Cir., 143 F.2d 570; Titus v. United States, 10 Cir., 150 F.2d 508, 162 A.L.R. 991, certiorari denied, 326 U.S. 773, 66 S.Ct. 230, 90 L.Ed. 467.

Where a covenant not to compete constitutes a nonseverable element of a transaction in which the owner of a going concern sells the property and transfers the good will of the business, the covenant is to be treated as a contributing element of the assets transferred and the entire revenue received is subject to tax on the basis of a capital gain. Toledo Newspaper Co., 2 T.C. 794; Michaels, 12 T.C. 17. But if a covenant not to compete can be segregated in order to be assured that a separate item has actually been dealt with, then so much as is received for the covenant is ordinary income rather than income from the sale of a capital asset. Estate of Mildred K. Hyde, 42 B.T.A. 738; Horton, 13 T.C. 143.

In the transaction under consideration no title to the property or assets of a going concern passed from one ownership to another. These taxpayers and other owners of stock in the corporation did not sell the property, assets, or good will of a going concern. They merely sold stock. The contract for the sale of the stock contained a severable provision in which the sellers of stock covenanted not to engage in the newspaper business in a specified area. And it contained separate and distinct provision evaluating the stock and the covenant not to compete, the evaluation being computed on the basis of $150 per share for the stock and $50 per share for the covenant. Thus it is clear that the covenant not to compete was severable; that the parties dealt with it separately; and that the amount received for it was specified and therefore is ascertainable. The amount which the taxpayers received as consideration for the covenant is subject to tax as ordinary income, not income from the sale of capital assets. Cox v. Helvering, 63 App.D.C. 264, 71 F.2d 987; Salvage v. Commissioner, 2 Cir., 76 F.2d 112, affirmed, Helvering v. Salvage, 297 U.S. 106, 56 S.Ct. 375, 80 L.Ed. 511; Beals' Estate v. Commissioner, 2 Cir., 82 F.2d 268.

The decisions of the Tax Court are severally affirmed.