RAY H. SCHULZ AND DORIS L. SCHULZ, ET AL.,[1] PETITIONERS, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 67160–67162, 67310.   Filed May 19, 1960.

*Arthur B. Willis, Esq.*, and *John E. Scheifly, Esq.*, for the petitioners in Docket Nos. 67160, 67161, 67162.

*Hugh J. Ritchie, Esq.*, and *John C. McCall, Esq.*, for the petitioners in Docket No. 67310.

*Jack E. Roberts, Esq.*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: John W. Schulz and Lucille Schulz, Docket No. 67161; Melvin F. Klagues and Pauline Klagues, Docket No. 67162; and Stanley C. Landen and Victoria M. Landen, Docket No. 67310.

240

244

246

OPINION.

RAUM, *Judge:* 1. *Covenant not to compete.*—The question presented requires determination of the nature of the payments ostensibly made for Landen's covenant not to compete. Ray, John, and Klagues contend that the $18,000 was in fact paid as consideration for Landen's covenant, having been separately negotiated for, separately stated in the dissolution agreement, and having an importance to the continuing partners over and above their acquisition of Landen's interest in the partnership. Landen, on the other hand, argues that his covenant was valueless to the continuing partners. He takes

the position that he sold his interest in a going business which had experienced extraordinary growth and success, and that the $18,000 stated as consideration for his covenant in fact represented a "non-severable" portion of the consideration paid for his interest. We agree with Landen.

The record does not support the contention of the continuing partners that Landen's covenant was important, meaningful, and valuable to them for business reasons other than the prospect of tax deductibility. Ray, John, and Klagues knew that Landen had no intention of competing with them in the manufacture of proprietary items to which the business of Schulz Tool had become devoted. It was precisely because of Landen's disagreement as to the emphasis placed on this aspect of partnership business that he decided to sell out. His intention, disclosed to the other partners, was to open a machine shop to engage in job machine work, the same type of business that Schulz Tool had recently discontinued.

Ray, John, and Klagues admit that Landen did not have the necessary engineering background or sales contacts to begin a business competitive with Schulz Tool; to the contrary, his training as a machinist and toolmaker and his temperament were oriented toward job machine work rather than the design and development of proprietary items. Still more persuasive in this regard is the concession of the continuing partners on brief that the "equipment necessary to carry on an operation similar to that of Schulz Tool could not have been obtained by Landen in 1952 or within a year of his leaving the partnership, because of the priority system caused by the Korean conflict." Thus, the threat of competition from Landen during the year following dissolution was virtually nonexistent. In *Aaron Michaels*, 12 T.C. 17, 20, we refused to allocate any portion of the purchase price to the covenant not to compete, having noted that "the purchase of good will and right to service existing customers attained more than ordinary value," whereas "the ability of a new laundry to enter the field was apparently limited to newcomers arriving in the community—a factor tending to diminish not only the dollars and cents value of a covenant not to compete, but also its significance as an independent element of the sale of the business as a whole." Cf. *Richard Ullman*, 29 T.C. 129, 141, affirmed 264 F. 2d 305 (C.A. 2), where both the subsequent history and terms of the covenant demonstrated that competition from the covenantors was "a real menace." Furthermore, if the continuing partners really considered it important to protect Schulz Tool against competitive acts by Landen, it seems improbable that they would have agreed to pay $18,000 for a covenant limited to the period (12 months after February 29, 1952) when such competitive acts were least likely to occur.

In view of these circumstances, it is difficult to discern what practical importance or value the covenant could have had to the continuing partners, other than the reduced net cost to them, after taxes, of purchasing Landen's interest. Cf. *Commissioner* v. *Gazette Tel. Co.*, 209 F. 2d 926, 928 (C.A. 10), affirming 19 T.C. 692, where the Court of Appeals relied in part on the fact that "the covenant created a new and valuable right in the hands of the purchasers for which they paid a separate consideration."

The record, however, does support Landen's contention that Schulz Tool had built up considerable goodwill in its 5 years of operation prior to January 31, 1952, and that the $18,000 separately stated as consideration for his covenant in fact reflected such goodwill. See *Copperhead Coal Company* v. *Commissioner*, 272 F. 2d 45 (C.A. 6), affirming a Memorandum Opinion of this Court. The expertise, know-how, and efficiency of Schulz Tool, which resulted in its ability to undersell competitors while at the same time realizing above-average earnings per employee, are fully supported by the evidence. It is equally clear that Schulz Tool's products were most favorably received by the aircraft industry, and that its "active" customer accounts included substantially all major aircraft manufacturers, the Air Force, and the Navy. Cf. *D. K. MacDonald*, 3 T.C. 720, 726. Moreover, these customers were habitual in the sense that a basic design, once approved for use on a particular aircraft, would be re-ordered throughout the life of the aircraft, provided the supplier was able to make the necessary modifications. Although Schulz Tool had been in business for only 5 years and 3 months, it had proven its ability to develop basic designs and to keep pace with constantly changing design requirements. In *Sidney V. LeVine*, 24 T.C. 147, we held that substantial goodwill may be developed even during a relatively short period of operation, in that case 28 months; cf. *Erwin D. Friedland*, 26 T.C. 1005. All these factors contributed to the dynamic growth of the valve manufacturing business, evidenced by an average profit margin of 34.3 per cent, and greatly increased sales and earnings. The prospect of continued profits was confirmed by the impressive backlog of orders on hand as of January 31, 1952, whether that backlog be measured by the orders actually on hand or by the smaller amount known to Landen. While it is true, as the continuing partners allege, that the fluid nature of design requirements created substantial business risks, the presence of such risks merely discounts, rather than eliminates, the *amount* of goodwill which the partnership accumulated. In fact, the success and attendant goodwill of Schulz Tool were in large measure attributable to its ability to prosper in spite of these risks.

It was stated in *Ullman* v. *Commissioner*, 264 F. 2d 305, 307, that "when the parties to a transaction such as this one have specifically

set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration." We think such proof has been adduced in the instant case to show that Landen's covenant was in fact of little or no value to the continuing partners, whereas Schulz Tool had considerable goodwill not otherwise accounted for in arriving at the value of Landen's interest.

It is agreed that what Landen sold and what the continuing partners acquired was Landen's interest in Schulz Tool as a going business, and not merely his interest in the physical assets of the partnership. *Herbert A. Nieman*, 33 T.C. 411. Ray, John, and Klagues allege, however, that Landen's covenant was intended to protect Schulz Tool's "existing pool of labor" and its "active" customer accounts, that the covenant was important to them for these reasons, and that it was therefore "severable" from the overall interest transferred. As previously indicated, the importance attributed to the covenant by the continuing partners is not supported by the record. But even if we assume that the covenant was important for the reasons alleged, it is clear that a pool of skilled labor and active customer accounts are contributory elements to goodwill and to the value of a going concern. *Sidney V. LeVine, supra; A. Rhett du Pont*, 19 T.C. 377; *D. K. MacDonald, supra*. In this sense, the covenant was "nonseverable" from the goodwill inherent in Schulz Tool as a going concern, and likewise nonseverable from the interest in Schulz Tool which Landen transferred. As stated in *Harold J. Burke*, 18 T.C. 77, 80:

This Court has held that where a covenant not to compete accompanies the transfer of good will in the sale of a going concern, and such covenant is essentially to assure the purchaser the beneficial enjoyment of the good will he has acquired, the covenant is nonseverable and may not be depreciated. *Aaron Michaels*, 12 T.C. 17 (1949).

This result has been reached in instances, such as the present case, where a separate value is assigned to the covenant in the agreement of sale. *Toledo Blade Co.*, 11 T.C. 1079 (1948), affirmed per curiam 180 F. 2d 357 (C.A. 6), certiorari denied 340 U.S. 811. And in *Toledo Newspaper Co.*, 2 T.C. 794, involving the same transaction, we reached a similar conclusion with respect to the covenantor, even though the covenant was found to be customary in the purchase of a newspaper business and "necessary in order to prevent the seller from destroying the value of the good will of the business transferred."

The companion cases of *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761 (C.A. 10), affirming 19 T.C. 718, and *Commissioner* v. *Gazette Tel. Co., supra*, are distinguishable for the reasons stated in *Richard*

*Ullman, supra* at 139. As noted by the Court of Appeals in *Hamlin's Trust, supra* at 765, the taxpayers "merely sold stock"; they "did not sell the property, assets, or good will of a going concern." In contrast, Landen sold a direct proprietary interest in a going business which had developed considerable goodwill, and this goodwill was a contributing and integral factor in the sale.

For these reasons, we hold that the $18,000 ostensibly paid for Landen's covenant was in fact paid as part of the consideration for Landen's partnership interest in Schulz Tool. Accordingly, the payments in question represented capital gain to Landen and unamortizable, nondeductible, capital expenditures to Ray, John, and Klagues.

2. *Partnership income for February 1952.*—Partnership income for February 1952, was reported by Manufacturing on its return for the fiscal year ending January 31, 1953. Ray, John, and Klagues reported their distributive shares of this income in their returns for the calendar year ending December 31, 1953, pursuant to the general rule embodied in section 188 I.R.C. 1939.[2]

Ray, John, and Klagues now contend, however, that Tool was not dissolved until February 29, 1952, and that partnership income for February 1952 should have been reported by Tool in a separate partnership return for the month ended February 29, 1952. Respondent, on the other hand, argues that Tool was dissolved on January 31, 1952, and that the business was thereafter carried on by Manufacturing. We think that this issue must be decided against petitioners.

In the first place, we are satisfied on the evidence that Landen was no longer a member of the partnership after January 31, 1952. To be sure, the terms relating to the purchase of his interest had not yet been worked out, and he would undoubtedly have been entitled to an accounting if agreement had subsequently not been reached. But the evidence satisfies us that, beginning February 1, 1952, Landen no longer participated in the management of the enterprise, was no longer entitled to share in the profits of the enterprise, and was not in fact a partner. That he was given a "salary" for February 1952 reflects merely an act of decency by the remaining partners, knowing that he had no other source of income. In contrast to the "salaries" paid to Ray, John, and Klagues for February 1952, the evidence indicates that the "salary" paid to Landen was not treated on the books of Schulz Tool as the drawings of a partner. And the subsequent "Notice of Dissolution of Co-Partnership and Certificate of Business under Fictitious Name," published in April 1952, in respect

---

[2] SEC. 188. DIFFERENT TAXABLE YEARS OF PARTNER AND PARTNERSHIP.

If the taxable year of a partner is different from that of the partnership, the inclusions with respect to the net income of the partnership, in computing the net income of the partner for his taxable year, shall be based upon the net income of the partnership for any taxable year of the partnership * * * ending within or with the taxable year of the partner.

of Schulz Tool, simply recognized as a fact that which already existed, namely, that Landen had no connection with the business after January 31, 1952, and that commencing February 1, 1952, the business was conducted by the three remaining partners. Accordingly, since the "successor" partnership continued the business beginning February 1, 1952, with a fiscal year ending January 31, the income for the month of February 1952 was properly reported in the income of the partnership for its fiscal year ending January 31, 1953, and therefore the partners properly reported their distributive shares in their 1953 returns.

Moreover, the result reached above is required by approaching the problem from a different angle. The "dissolution" of a partnership caused by the retirement of a partner does not terminate the partnership's existence, cf. *Heiner* v. *Mellon*, 304 U.S. 271, nor does it warrant the filing of a separate partnership return for the period between the end of the previous fiscal year and the date of "dissolution." Where, as in the present case, the continuing partners carry on the business of the partnership without interruption, and do not wind up or liquidate it, they have no authority for departing from the partnership's regular fiscal year basis. *Mary D. Walsh*, 7 T.C. 205; Rev. Rul. 144, 1953–2 C.B. 212; cf. *Anne Jacobs*, 7 T.C. 1481; *Louis Karsch*, 8 T.C. 1327, 1331.

We hold that Ray, John, and Klagues correctly reported in their 1953 returns their distributive shares of partnership income for the full 12-month period ending January 31, 1953, including the disputed income for the month of February 1952.

*Decisions will be entered under Rule 50.*