Walter Kunz and Evelyn Kunz v. Commissioner.
Kunz v. Commissioner
Docket No. 86969.
United States Tax Court
T.C. Memo 1962-276; 1962 Tax Ct. Memo LEXIS 33; 21 T.C.M. (CCH) 1454; T.C.M. (RIA) 62276; November 21, 1962
*33 Held, that where the principal petitioner purchased from a corporation in a single transaction, substantially all the assets of a going business, and caused a separate "purchase price" to be assigned to each of the numerous assets acquired in said transaction, the Commissioner, in computing the petitioner's deductible loss on the immediate resale of a portion of said assets, is not bound to accept such assigned "purchase prices" as the cost basis of the assets so resold, where the evidence establishes that these "prices" were not realistic or bona fide. Held, further, that the cost basis which the Commissioner determined for said resold items is sustained by reason of petitioner's failure to prove error therein. Donald E. Calhoun, Esq., for the petitioners. Dennis J. Fox, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in income tax against petitioners for years and in amounts as follows: Calendar Year
Deficiency
1954
$ 9,559.95
1955
36,955.11
1956
23,710.06
The issues to be here decided are these: The principal petitioner purchased from a corporation in a single transaction, substantially all the assets of a going business, including the good will; and in connection therewith, the parties assigned a separate "value" or "price" to each of the numerous assets involved in the transaction, in such manner that 70 percent of the aggregate "prices" so assigned to all the corporate assets was attributed to 19 items of used equipment which were promptly thereafter sold as junk by petitioner, for amounts that were far less than the "prices" that had been assigned thereto. In such circumstance: (1) Are the "prices" which were so assigned to *35 the junked assets, conclusive - so that the Commissioner was precluded from attributing revised cost bases thereto, for the purpose of computing the amount of petitioner's deductible loss from the junk sale; and (2) if said assigned "prices" are not conclusive, should the revised cost bases which the Commissioner determined, be approved? All other issues raised by the pleadings have been resolved by stipulation of the parties; and adjustments respecting the same will be handled in the computation to be made herein under Rule 50. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and all exhibits attached thereto are incorporated herein by reference. The petitioners, Walter and Evelyn Kunz, are husband and wife residing in Cincinnati, Ohio. They filed a joint income tax return for each of the taxable years involved, with the district director of internal revenue at Cincinnati. During the year 1955 and also for several years prior thereto, Walter Kunz (herein called the "petitioner"), was engaged as a sole proprietor in a business of contracting for heavy construction work, including the building of streets and highways. Also during this same *36 period, he owned and operated as a sole proprietor, two concrete "batching" plants located in Bethel, Ohio, and in Tabasco, Ohio, from which ready-mixed concrete was sold and delivered for use on various construction jobs in that Ohio area. None of the product of these plants was sold for use in the nearby Kentucky area, for petitioner believed that state licensing regulations and tax laws made it impracticable for him to deliver his product across the state line. In the early part of 1955, petitioner learned that the president of a corporation named Concrete, Inc., which operated a ready-mixed concrete plant in Newport, Kentucky, had died; and that the plant and operating assets of said corporation were for sale. Petitioner was acquainted with this plant and he was immediately interested in the possibility of purchasing the same; for at that time the ready-mixed concrete business was experiencing a "boom" in the Cincinnati and northern Kentucky areas, and he believed that if he could acquire said plant which was available for immediate use, he would be able to realize a profit from selling ready-mixed concrete in Kentucky where he was not then making any sales. Accordingly in *37 July 1955, petitioner contacted Eunice Rawlings, the widow and administratrix of the estate of R. Willard Rawlings, who at the time of his death had been the president and principal stockholder of Concrete, Inc. Eunice held the controlling stock interest in said corporation, either in her fiduciary capacity or individually; and she also owned individually, the land and buildings which the corporation used in its operations. Petitioner thereupon began negotiations with Eunice for his possible purchase of both the corporate assets and the plant site; and he also, shortly thereafter, went to Newport and viewed these properties. Subsequently on August 20, 1955, petitioner met with Eunice in her apartment in Fort Thomas, Kentucky; and there the two of them conferred regarding petitioner's contemplated purchase. By this time, a new president had been elected for Concrete, Inc.; but neither he, nor any representative of the minority stock interests, was present. During the course of this meeting, petitioner and Eunice agreed upon a plan whereby petitioner would purchase from the corporation, through Eunice's exercise of her power as the controlling stockholder, not only the Kentucky batching *38 plant and its operating equipment, but also the corporation's good will; and whereby he also would purchase from Eunice individually, the land and the buildings which comprised the plant site. With a view to effectuating such plan, Eunice and petitioner then proceeded as follows. First, they agreed upon a typed itemized list of all the corporation's physical assets, which included not only the heavy equipment that comprised the batching plant itself, but also various trucks and concrete mixers, items of office equipment, items of garage equipment, and miscellaneous spare parts and tires. They then added to this list, two other principal items entitled, "Goodwill of Concrete, Inc." and "Real Estate" (being the realty which Eunice owned personally). They next assigned to each and every one of these items, under a marginal column entitled "Value," a specific dollar amount - the aggregate of which amounts was exactly $60,000. A summary of all these individual items and values is as follows: "Value"
Assigned
Eunice's individually owned
real estate, including land
and buildings
$13,000
Corporate assets: Good will
$ 2,000
Batching plant, including: 450 bbl. bulk storage tank,
40 ft. high; 100 ton batch-
ing bin with elevator and
scales; and bucket ele-
vator, 40 ton per hour
capacity
5,543
19 used trucks and mixers
(which are the particular
items here directly in-
volved)
32,900
Various other assets
6,557
47,000
$60,000
*39 The 19 above-mentioned used trucks and mixers to which the $32,900 "value" was assigned, were all old equipment which had no substantial value except for scrap or junk; and, as hereinafter shown, all of the same actually were sold as junk for a total of $1,495, approximately 4 months after said "value" of $32,900 was so assigned to the same. After Eunice and petitioner had completed said list of items and "values," petitioner agreed that he would present an offer to Concrete, Inc., to buy all the listed corporate assets for said assigned "values" of $47,000; and Eunice agreed that she, as the controlling stockholder, would attempt to have the corporation close the deal on said basis. Thereafter on August 27, 1955, a meeting was held at which those present included: Harry Luedeke, president of Concrete, Inc.; Eunice; petitioner; and various attorneys and accountants. Petitioner there presented his offer to buy all the corporation's assets other than the cash and accounts receivable, for the above-mentioned aggregate price of $47,000. But Luedeke, who stated that he represented not only the corporation but also the minority stockholders, refused to accept the offer, on the grounds *40 that he had not participated in the prior negotiations between Eunice and petitioner, and was not prepared to proceed further at the time. Eunice then told Luedeke that she held the controlling stock interest; and that if he did not agree with the offer, she could force it through anyway. However, after conferring with her attorney, she further stated that she would "guarantee" that petitioner would get the assets on the agreed basis, but that she did not want "to ram it [the deal] down anybody's throat," and the closing should be deferred. Thereupon, the meeting broke up. During the following week and under date of August 31, 1955, attorneys representing Eunice and the corporation sent a letter to petitioner, in which they referred to his above-mentioned offer, and in said letter, they gave him authority to take over and operate the business of Concrete, Inc., effective as of September 1, 1955. Said letter further stated: It is stipulated and agreed between the parties hereto that just as soon as all details may be determined, and a meeting of the stockholders of such corporation can be had in order to ratify, confirm, and authorize the action, necessary documents will be prepared *41 by which the business site (real estate at Licking Pike and C. & O. R.R., Newport), and the assets of the business (exclusive of cash accounts, accounts receivable, and accounts payable) will be transferred and conveyed to you, and subsequently the corporation will be dissolved. * * * Thereupon petitioner, acting pursuant to the authority given him in said letter, took possession of the Newport batching plant of Concrete, Inc., as of September 1, 1955; and he thereafter operated the same, first as a sole proprietor under the name of Newport Concrete Co., and subsequently as a corporation under the same name. Under date of December 15, 1955, a bill of sale covering all the above-mentioned assets of Concrete, Inc. was executed and delivered to petitioner. In this, there was set forth a total price for all the listed corporate assets of $47,000, payable in installments over a 3-year period; and there also was set forth therein, a separately stated "value" or "price" for each of the numerous particular assets, which was exactly equal to that which Eunice and petitioner had theretofore assigned to the same. This bill of sale was recorded on December 19, 1955. Within 48 hours thereafter, *42 on December 19 and 20, 1955, petitioner sold to junk dealers for the total amount of $1,495, all the 19 used trucks and mixers to which the above-mentioned $32,900 stated "value" or "price" had been assigned. Petitioner and his wife, in their joint income tax return for 1955, claimed as an ordinary business loss on said junk sale, a deduction of $25,899.44 - representing the difference between the assigned "purchase prices" of $32,900 and the $1,495 received from the junk dealers, less depreciation computed from September 1, 1955, which also was claimed as a deduction. The Commissioner however, in his notice of deficiency, determined that the loss incurred on said junk sale was only $867.50. In taking such action, the Commissioner further determined that the cost basis of said assets did not exceed $2,700, and that the amount of depreciation allowable thereon was $337.50. The following comparative table shows as to each of said 19 items, the cost bases claimed by petitioner, the amounts realized by petitioner from the junk sale, and the revised cost bases allowed by the Commissioner: Cost basis
Amount
Cost basis
claimed by
received on
determined by
petitioner
sale as junk
Commissioner
1952 Ford Tractor
$ 500
$ 200
$ 300
1945 G.M.C. Tractor
300
90
150
1946 International Tractor
300
100
150
1946 International Tractor
300
100
150
1947 White Tractor
400
125
200
1942 G.M.C. Tractor
300
90
150
1942 G.M.C. Tractor
$ 300
$ 90
$ 150
Smith Mixer, Ser. #53392
2,500
150
Smith Mixer, Ser. #53390
2,500
150
Smith Mixer, Ser. #54606
3,000
500
200
Ransome Mixer
2,500
150
Jaeger Mixer, Ser. # J4536
2,500
25
100
Jaeger Mixer, Ser. # J4700
2,500
25
100
Jaeger Mixer, Ser. # J4653
2,500
25
100
Jaeger Mixer, Ser. # J4693
2,500
25
100
Jaeger Mixer, Ser. # J5322
2,500
25
100
Jaeger Mixer, Ser. # J4539
2,500
25
100
Jaeger Mixer, Ser. # J5656
2,500
25
100
Jaeger Mixer, Ser. # J5650
2,500
25
100
$32,900
$1,495
$2,700
*43 Opinion 1. The first question to be decided is: Whether, in the circumstances here present, the separate "purchase prices" which Eunice Rawlings and petitioner assigned to the numerous assets of Concrete, Inc., and which were thereafter set forth in the bill of sale covering substantially all the assets employed by said corporation in its going business, conclusively establish the cost bases to be used in computing petitioner's deductible loss from the subsequent resale of a portion of said assets. In our opinion, this question must be answered in the negative. For it is now well settled that, in determining the cost bases of particular assets that were acquired in purchasing substantially all the assets of a going business in a single transaction, the Commissioner is not bound to accept the parties' allocation; and that instead, he may reallocate the aggregate purchase price according to what he deemed to be the realities of the transaction. Copperhead Coal Co. Inc. v. Commissioner, 272 F. 2d 45 (C.A. 6), affirming a Memorandum Opinion of this Court; Hamlin's Trust v. Commissioner, 209 F. 2d 761 (C.A. 10), affirming 19 T.C. 718; Sidney V. LeVine, 24 T.C. 147; *44 C. D. Johnson Lumber Corporation, 12 T.C. 348.see also Income Tax Regs., section 1.61-6, and section 1.167(a)-5. In the Copperhead Coal Co. case, supra, wherein a corporation purchased a coal mining operation from a partnership for $1,000,000, and in the sales contract attributed an agreed "sale price" to each asset listed therein (without assigning any value to good will), the Court of Appeals for the Sixth Circuit said: The fact that the good will, or the value of the company, as a going concern, was not discussed by the partners and the corporation in their negotiations, or in the contract of purchase, is not controlling, as to the government, for the recitals made in a written statement, as to the consideration received, are not necessarily conclusive, and it is always competent to inquire into the consideration and show by intrinsic evidence what the real consideration was. The Tax Court is not bound by the allocation of values made in the purchase contract, and is free to increase or decrease the amounts so allocated in accordance with the facts. * * * Likewise, in the case of Hamlin's Trust, supra, the Tenth Circuit said: *45 It is well settled that the incidence of taxation depends upon the substance of a transaction; that tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title; and that the Government may look at the realities of a transaction and determine its tax consequences despite the form or fiction with which it was clothed. * * * [Citing cases.] Also, the fact that the separately assigned "purchase prices" may have been entered in the purchaser's books of account, is not controlling; for as the Supreme Court said in Doyle v. Mitchell Bros. Co., 247 U.S. 179: [Book] entries are no more than evidential, being neither indispensable nor conclusive. The decision must rest upon the actual facts, * * * To the same effect, see also Emanuel M. (Manny) Kolkey, 27 T.C. 27, affd. (C.A. 7) 254 F. 2d 51. The above-stated principles are here applicable. And, after considering and weighing all the evidence herein, we are fully satisfied that the "purchase prices" aggregating $32,900, which petitioner and Eunice Rawlings assigned to the 19 used items of equipment that *46 petitioner immediately resold as junk, were fictitious, absurd, and not bona fide. This conclusion is supported by the facts that 70 percent of the total $47,000 which petitioner paid for substantially all the corporation's assets, was assigned to the 19 junked items which are here directly involved; and that most of the 12 mixers included among said junked assets actually were immediately resold for $25 each (which is only 1/100th of the $2,500 "purchase price" which had been assigned thereto). Our above conclusion is supported also by the credible and unimpeached testimony of August Richter, a man engaged in the concrete business who had examined said items shortly before petitioner bought them; and who testified that such items had no substantial value and were "just practically junk." We are further satisfied that the petitioner, who had previously purchased both new and used equipment of the type here involved for use in his other concrete businesses, must have been aware that the "purchase prices" which he caused to be assigned to said 19 items were grossly excessive, fictitious, and not bona fide. We hold, on authority of the above-cited cases as applied to the evidence *47 herein, that the Commissioner was amply justified in rejecting said assigned "prices," and in determining a revised cost basis for said 19 junked items. 2. The remaining question is whether the revised cost basis, which the Commissioner determined in computing petitioner's deductible loss on the resale of said 19 junked items, should be approved. Petitioner had the burden of establishing error in said determination of the Commissioner; and he has failed to carry such burden. He presented no proof which would even tend to establish either the respective fair market values or the relative values of the numerous assets which he acquired in buying the plant, equipment and good will of Concrete, Inc. And he also presented no evidence which would tend to establish either the condition or value of any of the particular 19 items involved. Thus he has provided no factual foundation for his contention that the cost basis which the Commissioner determined, is either arbitrary or erroneous. Actually, the $2,700 cost basis which the Commissioner allowed for the items in question, is substantially more than the $1,495 which petitioner realized from his immediate resale of the same. We sustain *48 the Commissioner's determination, by reason of petitioner's failure to prove error therein. Decision will be entered under Rule 50.