JOHN B. RESLER AND SANDRA RESLER, ROSEANNE R. NEWMAN, ROBERT ARONSON AND JOAN ARONSON, CHRISTINE B. ARONSON, JANE E. ARONSON, ANDREW D. ARONSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HERCULES TROUSER COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent [1]
Resler v. Commissioner
Docket Nos. 3840-77, 6922-77
United States Tax Court
T.C. Memo 1979-40; 1979 Tax Ct. Memo LEXIS 486; 38 T.C.M. (CCH) 153; T.C.M. (RIA) 79040; January 29, 1979, Filed *486 An allocation of the purchase price with respect to the sale of assets was made in an agreement between the buyer and seller. Held, the parties to the agreement are bound by the allocation of the purchase price to the various assets as set forth therein. John M. Adams and Glenn A. Nadell, for the petitioners *487 in Docket No. 3840-77. Arthur Shapiro and Nelson E. Genshaft, for the petitioner in Docket No. 6922-77. Donald W. Mosser, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent, on April 6, 1977, issued statutory notices in which he determined deficiencies in the respective petitioners' Federal income taxes as follows: Taxpayer
Year Ended
Amount
John B. Resler and Sandra Resler
12/31/72
$ 6,382.00
Roseanne R. Newman
12/31/72
13,829.10
Robert Aronson and Joan Aronson
12/31/72
1,437.00
Christine B. Aronson
12/31/72
1,413.11
Jane E. Aronson
12/31/72
1,413.11
Andrew D. Aronson
12/31/72
1,175.80
Hercules Trouser Co., Inc.
4/30/73
45,269.00
Hercules Trouser Co., Inc.
4/30/74
64,244.00 After concessions by the parties in Docket No. 6922-77 the issue before the Court is whether petitioners should be bound by the allocation of the purchase price set forth in an agreement with respect to the sale of assets between the individual petitioners and the corporate petitioner. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, *488 supplemental stipulation of facts and exhibits attached thereto are incorporated herein by this reference. John B. Resler, Sandra Resler, Roseanne R. Newman, Christine B. Aronson and Jane A. Aronson are all individual taxpayers who resided in Columbus, Ohio at the time their petitions were filed herein. Robert Aronson, Joan Aronson and Andrew D. Aronson are individual taxpayers who resided in Westerville, Ohio at that time. All the above petitioners in Docket No. 3840-77 filed their calendar year 1972 individual Federal income tax returns with the office of the internal revenue service, Cincinnati, Ohio with the exception of John B. Resler and Sandra Resler, husband and wife, and Robert Aronson and Joan Aronson, husband and wife, who filed joint Federal income tax returns for that year at the same office. South Columbia Corporation was incorporated in Delaware on November 10, 1972. Its principal office is located in Wilmington, Delaware. Historically it is a derivative of a statutory merger, which took place on December 13, 1972 under the laws of Ohio and Delaware, of an Ohio corporation, South Columbia Corporation, with a Delaware corporation of the same name. The predecessor *489 to the Ohio corporation was Hercules Trouser Company, an Ohio corporation engaged in the manufacture of men's trousers which had been incorporated on October 23, 1935. On July 26, 1972 Hercules Trouser Company changed its name to South Columbia Corporation. South Columbia Corporation, in all its various corporate forms, will hereinafter be referred to as Old Hercules. Hercules Trouser Company, Inc. (hereinafter New Hercules), petitioner in Docket No. 6922-77, is an Ohio corporation which was incorporated June 24, 1972. Its principal place of business was located in Columbus, Ohio at the time its petition was filed herein. New Hercules filed corporate Federal income tax returns for its fiscal years ended April 30, 1973 and April 30, 1974 with the office of the internal revenue service, Cincinnati, Ohio. Since July 26, 1972 New Hercules has been engaged in the business of manufacturing men's trousers. Old Hercules filed a U.S. Small Business Corporation Income Tax Return (Form 1120S) for its fiscal year ended October 31, 1972 with the office of the internal revenue service, Cincinnati, Ohio. The election provided by section 1372, I.R.C. 1954, was made and in effect with respect *490 to Old Hercules for its fiscal year ended October 31, 1972. During that year Old Hercules' shareholders and the number of shares owned by each were as follows: Shareholder
Number of Shares
Jack S. Resler
3,314 [2]
Eleanor S. Resler
446 [2]
John B. Resler
816
Roseanne R. Newman
816
Christine B. Aronson
105
Jane E. Aronson
105
Andrew D. Aronson
96
Robert S. Aronson
110
Jack S. Resler (hereinafter Resler) was president, chief executive officer and principal shareholder of Old Hercules. In 1972 Resler was 68 years of age. He had a son and daughter, John B. Resler and Roseanne R. Newman, who were shareholders of the business but not active therein. For approximately 3 years prior to July 26, 1972 Resler had made various attempts to sell all of the operating assets of Old Hercules.Negotiations were held with Bond Industries, Kayser Roth, U.S. Industries, Leslie *491 Fay and A.S. Beck and Company. Resler was only interested in selling the working assets of the corporation for cash while retaining stock worth approximately $ 205,000 that the corporation owned. In the fall of 1970 Sam Forman (hereinafter Forman) manifested an interest in purchasing Old Hercules. Resler had met Forman that summer in the office of A.S. Beck. Forman has no relationship to Resler or to his family by blood or marriage. Late in 1970 an agreement was reached under which Forman was to be employed by Old Hercules. Under the agreement he was to receive $ 5,000 a month plus 10 percent of the pre-tax profits from which the salary was to be deducted if such profits exceeded $ 600,000 as compensation for services rendered. He did work for Old Hercules from February 1, 1971 until June 1, 1971. His employment was terminated, for a consideration of $ 50,000, on a less than amicable basis. Early in 1972 Forman approached Resler at a restaurant with an offer to purchase Old Hercules. Resler responded orally that he would sell the company to the first person to put $ 7,000,000 cash in his hand. Following this conversation one Calvin Breit, an attorney from Norfolk, Virginia *492 who had been with Forman during this exchange, visited the plant and discussed the possible purchase with Resler. Resler also furnished Forman with the financial figures from past years, including financial statements and profit and loss statements for the fiscal years 1968 through 1971. To raise the purchase price Forman first went to several banks but eventually spoke to a management consulting firm, Arthur D. Little and Company. Through Little, Forman and Resler met with Jean DeValpine, a representative of a trust fund maintained for the employees of Textron, Inc., to discuss the acquisition of Old Hercules. DeValpine then requested an audit of the April 30 figures (the end of a 6-month period) by independent accountants. Resler agreed to the audit on the condition that, if the purchase was consummated, he would fund the audit; if it fell through, the purchaser would be responsible for the cost of the audit. The initial draft of the asset purchase agreement was drawn up by Forman's attorneys. Petitioner's attorney, Lawrence Stanley (hereinafter Stanley), had several objections to it and advised against its execution. Stanley called in a second attorney, John A. Dunkel *493 (hereinafter Dunkel), who specialized in Federal income taxation. Subsequently, the issue of depreciation recapture was raised along with the suggestion that the problem could be deterred by an allocation of the purchase price in the agreement. Stanley, on May 3, 1972, sent Forman's attorney, Stanley Schwartz (hereinafter Schwartz), a proposed revision of the original draft which did not contain an allocation of the assets. In early May, due to an expected calendar conflict, Stanley turned the negotiations over to Dunkel. Dunkel and Schwartz met to discuss the proposed agreement on May 19 and again on May 23. Dunkel then met with Resler and his accountant on June 14. On June 19 Schwartz sent a revised draft to Dunkel which did not contain an allocation of the purchase price. Resler, Dunkel and Schwartz again met on June 28. On June 29 Arthur Young & Company, the independent auditors, issued their report with respect to the financial statement of Old Hercules as of April 30, 1972. Up to that point the parties had only the figures prepared by Old Hercules' accountant. On July 3 Dunkel sent a redraft of the agreement back to Schwartz. This draft contained a breakdown of items *494 to and among the various assets being sold for the purpose of avoiding depreciation recapture income to Old Hercules. On July 12 the attorneys again met to discuss the contract and the following day Dunkel sent to Schwartz the draft which was accepted by the parties as final. This draft contained allocation figures derived from the April 30 financial statement. That same day Schwartz forwarded copies of this draft to his clients. The attorneys met on July 20 and July 25. The closing was held on July 26, 1972. At no time did Schwartz object to the allocation of the purchase price. Pursuant to the final agreement as of April 30, 1972 Old Hercules sold all its operating assets to New Hercules in consideration of the sum of $ 6,791,248 in cash plus the assumption of Old Hercules' balance sheet liabilities and liabilities arising thereafter in the course of business and the assumption of Old Hercules' contracts, agreements, leases and commitments described in the agreement. Subparagraph 1(c) of the agreement further provided: The aggregate amount of the foregoing consideration shall be allocated to and among the various properties conveyed by Hercules to Buyer described in subparagraph *495 (a) of paragraph 1 and shall constitute the individual selling price thereof, as follows: Cash $ 665,763.29
Accounts receivable
1,970,030.38
Inventory
3,019,989.08
Prepaid Insurance
12,738.71
Deferred expense: Equipment rental
1,600.00
Trademarks
625.11
Property & franchise taxes
45,747.57
Deposit - Industrial Commission
14,162.00
Deposit - TWA
425.00
Leasehold Improvements: Ohio plants
31,012.55
Fordyce plant
26,979.72
Machinery and Equipment: Ohio plants
115,999.01
Fordyce plant
20,298.68
Trucks and auto
14,498.43
$ 5,939,869.53
The balance of the aggregate amount of such consideration shall be allocated to the remainder of the properties conveyed by Hercules to Buyer described in subparagraph (a) of paragraph 1. Subparagraph 1(a) referred to above provided: 1. Purchase and Sale of Business and Assets of Hercules. (a) At Closing (hereinafter defined), Hercules will sell, convey, transfer and deliver to Buyer all of Hercules' property and assets of every kind and description, real and personal, tangible and intangible, and its business as a going concern (including all of Hercules' good will and all rights to the *496 use of the name "Hercules" or any variant thereof), including, without limitation, all of the property and assets of Hercules reflected on its balance sheet at April 30, 1972 (except those since sold in the ordinary course of business) excepting only the following property and assets which shall be retained by Hercules: (i) Hercules' corporation charter, seal, minute books, stock transfer books and other records relating exclusively to its organization and existence as a corporation and treasury stock; and (ii) Its portfolio of securities (the stocks, bonds, and securities of other corporations) reflected in its balance sheet at April 30, 1972 (or the proceeds thereof if any such security is sold between April 30, 1972 and Closing Date) and cash in an amount equal to the dividends and interest received on such portfolios of securities between April 30, 1972 and Closing Date (or on the proceeds thereof if any such security is sold between April 30, 1972 and Closing Date); and (iii) Cash in the amount of $ 888,207. The amounts so allocated were Old Hercules' book values for each of the items as of April 30, 1972. These book values represented the adjusted basis of such assets *497 for Federal income tax purposes. Old Hercules' costs, per books, and the allowable depreciation with respect to machinery and equipment, and trucks and auto reflected in subparagraph 1(c) of the agreement were as follows: Item
Cost Per Books
Depreciation
Net
Machinery & Equipment [3] $ $ $ Ohio plants
574,489.86
458,490.85
115,999.01
Fordyce plant
117,725.06
97,426.38
20,298.68
Trucks & Auto [4]
58,173.97
43,675.54
14,498.43 These items are section 1245 property as defined in section 1245(a)(3)(A). Of the depreciation allowed with respect to "Machinery & Equipment, Ohio plants", the amount of $ 213,682.90 was incurred after December 31, 1961. Of the depreciation allowable with respect to "Machinery & Equipment, Fordyce plant", the amount of $ 62,720.64 was incurred after December 31, 1961. Of the depreciation allowable with respect to "Trucks & Auto", the amount of $ 7,833.57 was incurred after December 31, 1961. *498 On its U.S. Small Business Corporation Income Tax Return (Form 1120S) for the fiscal year ended October 31, 1972 Old Hercules reported the sale of its assets pursuant to the allocation of the selling price as set forth in subparagraph 1(c) of the agreement and reported no gain from the sale of section 1245 assets.
Immediately following the July 26 closing the board of directors or principals of New Hercules concluded that the value of the assets acquired, and therefore, the stated capital, under the purchase agreement exceeded the amounts set forth on Old Hercules' books and that an insurance binder should be obtained on the assets in excess of the present insurance coverage. On November 2, 1972 an officer of New Hercules wrote The American Appraisal Company, Inc. requesting that a representative contact New Hercules with respect to an appraisal of personal property. The American Appraisal Company, Inc., by letter dated December 26, 1972, set forth proposed recommendations with respect to an appraisal. As previously referred to herein, a trust created under an employee benefit plan for the benefit of employees of Textron was one of the initial investors in New Hercules. On February 8, 1973 Charles *499 F. Chapin, Vice-President-Investment Management of Textron, suggested that New Hercules could assign to the purchased assets values for depreciation purposes other than those stipulated in the agreement. Such values could be supported by an outside appraisal. He also suggested that inventory values be adjusted and stated that: Since Goodwill must now be written off to obtain Certified Statements, it would seem to make good sense to assign as much as possible to depreciable assets and therefore create tax savings and an improved cash flow. The appraisal company issued a report dated July 27, 1973 with respect to the valuation of properties as of April 30, 1972. On its corporate income tax return for the fiscal year ended April 30, 1973 New Hercules used the values suggested by that appraisal. On Schedule G of its return it reported the following depreciable assets, at the following cost or other basis, all of which were assigned an acquisition date of July 1, 1972: Cost or Property
Other Basis
Buildings $ 375,000.00
Furniture & Fixtures
64,808.00
Transportation Equipment
47,710.00
Machinery & Other Equipment
708,107.00
Leasehold Improvements
235,000.00
$ 1,430,625.00
*500 Included in the property designated "Machinery & Other Equipment" on that schedule were the items of "Machinery & Equipment, Ohio plants and Fordyce plant" listed in subparagraph 1(c) of the purchase agreement. The amounts assigned to these items were $ 515,461 for the Ohio plants and $ 111,805 for the Fordyce plant. Included in the property designated "Transportation Equipment" were the "Trucks & Auto" listed in subparagraph 1(c). The amount assigned to these items on Schedule G was $ 22,332.
On April 6, 1977 respondent issued notices of deficiency to the petitioners in Docket No. 3840-77. Therein he determined that petitioners' distributable ordinary income from Old Hercules should be increased in 1972 because Old Hercules realized ordinary income on the sale of certain assets under sections 1245 and 1250 from the recapture of depreciation claimed after January 1, 1962. On the same day respondent issued a notice of deficiency to New Hercules for its taxable years ended April 30, 1973 and 1974. Therein he determined that New Hercules' depreciation deductions were overstated for its taxable years 1973 and 1974 and that it must compute depreciation on its assets based on the allocation *501 set forth in the purchase agreement. OPINION The parties before the Court represent both the buyer and the seller of the working assets of a trouser manufacturing corporation. The issue presented by the parties is whether they should be bound by the allocation of the purchase price to the various assets as set forth in the purchase agreement. Respondent's basic position is that of a stakeholder between the adverse interests of the parties. The purchase agreement herein specifically allocated the purchase price to the various assets transferred thereby. When the subject agreement makes a specific reference to the allocation in issue we have adopted the "strong proof" standard. Schmitz v. Commissioner,51 T.C. 306, 318 (1968), affd. on another issue sub. nom. Throndson v. Commissioner,457 F.2d 1022 (9th Cir. 1972). Under this standard the taxpayer asserting a position contrary to the agreement must present strong proof that the subject clause was not bargained for by the parties or that such clause had no business or economic reality. Ullman v. Commissioner,264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957). *502 Thus we must look to the substance of the transaction. Herein both the buyer and the seller were represented by tax attorneys. The allocation (which benefited the seller) was discussed by the attorneys and understood by both Resler and Forman. The buyer's attorney was under instructions to accept the deal as stipulated by Resler. However, lack of discussion with respect to the allocation does not affect the effectiveness of the agreement when the parties understand the contract. Hamilin's Trust v. Commissioner,209 F.2d 761, 765 (10th Cir. 1954). Forman complains that he was forced to accept the contract as stipulated because Resler, who was under no contractual agreement to finalize the sale, was apt to back out at the last minute leaving Forman with a $ 100,000 payment due to the independent auditors for a review of Old Hercules' books. However, Forman had known Resler since 1970, had worked with Resler in 1971 and had every reason to know the bargaining position he was placing himself in before he commenced negotiations. That there may have been some inequality in the bargaining posture of the two parties is of no concern to this Court where there is no *503 suggestion of coercion to commence negotiations. In addition, because Forman had previously purchased other companies, he could not be considered a novice with respect to the pressures encountered in such situations. We find that the buyer has failed to present strong proof that the agreement and the allocation clause were not understood by the parties or were not the result of an arms-length bargain. Forman next contends that the allocation had no business or economic reality. In support thereof he submits the appraisal report New Hercules commissioned subsequent to the execution of the sales agreement. [5] Forman testified that the purpose of the appraisal was to establish a stated capital figure. His witness testified that another purpose was to establish a basis for increased insurance coverage. The appraisal itself, states that it "was made for the purpose of expressing an opinion of the fair market value of the property, as of April 30, 1972 to provide a basis for allocation of the purchase price to the assets acquired." The allocation in the purchase agreement was based on the independent examination of the seller's books by Arthur Young & Company. The mere existence of *504 a subsequent appraisal of the assets calculated on a different basis is not strong proof that the allocation in the agreement lacked economic reality. As is evident from the existence of this case, the allocation in the purchase agreement had business reality for both the buyer and the seller. The attorneys and the parties understood the tax implications. We find that the buyer has not presented strong proof that the allocation had no business or economic reality. Therefore, we accept the allocation of the purchase price as set forth in the sales agreement. Respondent maintains that there is no time like the present for adopting the standard of proof established in Commissioner v. Danielson,378 F.2d 771, 775 (3d Cir. 1967). However, adoption of the Danielson rule is unnecessary due to our finding that the buyer did not meet the lesser strong proof standard. We note that we have continuously rejected the Danielson *505 rule, Schmitz v. Commissioner,supra, and cases emanating therefrom, and that this case would be appealed to the Sixth Circuit which has employed the strong proof standard. Montesi v. Commissioner,340 F.2d 97, 99 (6th Cir. 1965); Golsen v. Commissioner,54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971); cert. den. 404 U.S. 940 (1971). Decision will be entered for the Petitioner in Docket No. 3840-77. Decision will be entered under Rule 155 in Docket No. 6922-77. Footnotes
1. The above entitled cases were consolidated for purposes of trial, briefing and opinion.↩
2. Jack S. Resler and Eleanor S. Resler are before the Court on this issue in Docket No. 5803-77. Their case was continued generally because it involves another unrelated issue that remains under consideration by the appellate division of the internal revenue service in another region.↩
3. These amounts are combined under the heading "Machinery & Equipment" on Old Hercules' April 30, 1972 balance sheet. ↩
4. This item is listed as "Transportation Equipment" on Old Hercules' April 30, 1972 balance sheet.↩
5. In view of our conclusion herein we will overlook the fact that the appraisal report, though stipulated into evidence, was not supported, or amplified on, by the testimony of any individual who authorized, or even worked on, the report.↩