FRED A. FELLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Feller v. Commissioner
Docket No. 7426-81.
United States Tax Court
T.C. Memo 1983-119; 1983 Tax Ct. Memo LEXIS 668; 45 T.C.M. (CCH) 902; T.C.M. (RIA) 83119; March 7, 1983. C. Garold Sims, for the petitioner. Donald T. Rocen and Robert Hallmark, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined that petitioner is liable as a transferee of BGF Corporation (BGF) for deficiencies in Federal income taxes and an addition to tax, plus interest as provided by law, determined to be due by BGF, as follows: Addition to Tax
Taxable Year Ended
Deficiency
[1] Section 6653(a)
2/28/75
$673
2/29/76
541
2/28/78
24,579
$1,229
The key issues for decision are: 1. Whether, and if so to what extent, the purchase price underlying the sale of the assets of BGF is specifically allocable *670 to a covenant not to compete and thus taxed as ordinary income. 2. Whether any part of BGF's underpayment of tax with respect to the taxable year 1978 was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). [2]
*671 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and exhibits are incorporated herein by this reference.
Fred. A. Feller (petitioner) was a resident of Collbran, Colorado, at the time of the filing of his petition herein.The Federal income tax returns for the years involved pertaining to BGF and petitioner were timely filed with the Internal Revenue Service Center at Ogden, Utah. BGF owned and operated a liquor store known as Green Mountain Liquors in Lakewood, Colorado, a suburb of Denver. Petitioner was the sole shareholder and president of BGF during its existence. Petitioner, a citizen of the United States, emigrated to this country from Austria in 1955. While in Europe, he was employed as a cheesemaker. Upon arriving in America, he continued work as a cheesemaker until deciding to change professions by purchasing a drive-in restaurant. Petitioner moved to Colorado in 1965, and subsequently he acquired several additional unrelated businesses. One of these businesses was the Green Mountain Liquor store. Green Mountain Liquors was purchased by BGF in January of 1968. In January 1976, petitioner's wife broke both of *672 her legs. Petitioner and his wife then decided, for reasons of health and scenery, to purchase a ranch in Collbran, Colorado for use as their principal residence. Collbran is located approximately 240 miles from Lakewood, Colorado. The purchase of the ranch in Collbran depended upon petitioner's successful sale of Green Mountain Liquors. Petitioner began contemplating the sale by BGF of Greden Mountain Liquors during the fall of 1976. Donald Klimke (hereinafter Klimke), who was residing in Seattle, Washington at the time, was referred to petitioner by a Denver banker. A friend of Klimke's who owned a liquor store in Denver was urging Klimke to also acquire a store in the Denver area so that Klimke could relocate there. Klimke traveled to Denver where he and petitioner met and discussed, in general, liquor store operations in the Denver area. At that time petitioner had already made arrangements to sell his store to a third party. Later petitioner's deal with the third-party purchaser fell through. Discussions then developed with Klimke for the purchase of Green Mountain Liquors.
On May 17, 1977, Klimke entered into a purchase agreement with BGF and petitioner whereby *673 Klimke agreed to buy all the assets of BGF (excluding its bank accounts, a 1972 Chevrolet pickup truck and a calculator) for $105,000 plus the value of the inventory. The purchase agreement was drafted by Klimke's attorney, whom Klimke had retained on the recommendation of his friend because the attorney had done the legal work for the purchase of the friend's liquor store. The purchase agreement contained the following specific provisions requiring price: 1. Purchase Price. The total purchase price shall be One Hundred Five Thousand Dollars ($105,000.00), plus inventory, apportioned as set forth hereinafter: a.Inventory. The value and price of all inventory shall be determined by agreement of the parties within one week following the approval by the City of Lakewood and the State of Colorado of Buyer's application for a license to operate the aformentioned liquor store. b. Equipment and Fixtures
$24,000.00
c. Covenant not to Compete.
80,000.00
d. Trade Name.
500.00
e. Good Will.
500.00
A covenant not to compete [3] was included in the purchase agreement at the insistance of Klimke, who had been told by his friend that he definitely should have *674 one for business purposes. It is unclear whether the allocation of $80,000 as the value of the covenant was set by Klimke or Klimke's attorney. Petitioner had determined his price for the store, which was finally accepted by Klimke, by speaking with other business men as to what they thought Green Mountain Liquors was worth. *675 No discussion of a covenant not to compete occurred before the May 7th date when the purchase agreements was signed. Klimke went to petitioner's home where they both read the agreement and discussed the provisions. Petitioner questioned the clause which allocated $80,000 to the covenant not to compete. Klimke explained to petitioner that he had been told by his friend that it was necessary for him to have one. Klimke also informed petitioner that he (Klimke) would receive a substantial tax benefit from the covenant. Petitioner did not question the term "good will" or the amount allocated thereto. After discussing the other portions of the agreement, both parties affixed their signatures. Subsequently, petitioner called upon his accountant, Michael Spillane (Spillane), and showed him a copy of the purchase agreement. Spillane informed petitioner that he should not have signed the agreement, and arranged a meeting between petitioner, Klimke, and himself to discuss the sale. At the meeting Spillane proposed to lower the amount allocated to the covenant not to compete. Klimke refused to do so without a corresponding reduction in the purchase price. There was no further discussion. *676 Spillane, believing that the allocation was totally unrealistic in light of petitioner's impending move to Collbran, Colorado, told petitioner that he was reporting the entire $80,000 as an amount received for goodwill on BGF's corporate income tax return for the fiscal year 1978. Petitioner had not, prior to signing the agreement, discussed the provisions of the purchase agreement with Spillane or with an attorney. Petitioner's wife owned and continues to own a liquor store within one mile of Green Mountain Liquors. Klimke was concerned that without a covenant not to compete the petitioner might work at his wife's liquor store and thereby hurt the business Klimke was purchasing. Klimke believed that the sale to him of Green Mountain Liquors would probably not have occurred (without a corresponding reduction in price) absent the presence of a covenant not to compete. On July 1, 1977, BGF, through petitioner, executed a bill of sale [4] whereby it acknowledged receipt of approximately $149,000 from Klimke and in exchange transferred to Klimke all its assets except the bank accounts, truck, and cvalculator. The purchase price in the bill of sale was allocated in the same manner *677 as in the purchase agreement signed May 17, 1977. The original bill of sale document presented to Klimke had no allocation of price. Klimke demanded that the sale price be allocated as in the purchase agreement or else he would call off the deal. Again the petitioner agreed to the allocation. The $44,000 difference between the May 17th $105,000 price and the July 1st $149,000 price represented the estimated value of the inventory, and was allocated as such.
On July 19, 1977, Klimke and BGF, through petitioner, entered into a supplemental purchase agreement which altered financing arrangements and also modified the covenant not to compete contained in the May 17th agreement. [5] In addition, the parties executed on that day a separate closing statement with respect to the purchase of Green Mountain Liquors. [6]
*678 On June 15, 1977, a special meeting of the shareholders of BGF was held at which petitioner recommended that the corporation dissolve and liquidate in accordance with the applicable statutes of the State of Colorado and the provisions of section 337. A Plan of Dissolution, Complete Liquidation, and Termination of the Existence of the Corporation was adopted. A Statement of Intent to Dissolve and Articles of Dissolution were filed with the Secretary of State of the State of Colorado on April 21, 1978. Pursuant to these proceedings, all of BGF's assets were distributed to petitioner, thereby leaving BGF without any assets to pay any deficiencies or additions to tax which might be determined involving the years in question. In its final corporate income tax return, BGF reported as distributions a liquidating dividend in cash of $84,121 and a liquidating dividend in property of $35,605. Petitioner reported these amounts as a liquidating dividend on his 1978 return (filed jointly with his wife).
If the allocation of $80,000 to the covenant not to compete is upheld, then that amount will not qualify for nonrecognition treatment under section 337. In turn, $80,000 is then taxable *679 as ordinary income to BGF for its fiscal year 1978. Correspondingly, net operating losses carried back from 1978 to the years ended February 28, 1975 and February 29, 1976 would no longer be available. Respondent accordingly determined deficiencies in the income taxes of BGF for those taxable years. On January 20, 1981, a statutory notice of deficiency was mailed to BGF in which the deficiencies and addition to tax contained in respondent's notice were determined. No petition by or on behalf of BGF requesting a redetermination of the deficiencies and addition to tax was filed with this Court, and the statutory period within which to petition from that statutory notice has expired. Also on January 20, 1981, a notice of transferee liability for the deficiencies and addition to tax determined with respect to BGF was mailed to petitioner, and he filed a timely petition herein. OPINION A threshold question here is whether petitioner is liable as a transferee of BGF under section 6901(a) for the latter's income tax liability and addition to tax for the years in question. Section 6901(a)[7] provides that the unpaid income tax liability of a corporation may be assessed against *680 and collected from a transferee of its assets in the same manner as against the corporation itself. But the substantive liability of the transferee must be determined under state law. See Commissioner v. Stern,357 U.S. 39 (1958).Moreover, respondent has the burden of proving that petitioner is liable as a transferee of BGF, (but not to show that BGF was liable for the underlying tax). Section 6902(a); Rule 142(d). Respondent has met this burden, [8] and petitioner is a transferee of BGF. *681 The main issue to be decided is whether the allocation of part of the purchase price of Green Mountain Liquors to a covenant not to compete specifically made in an agreement of sale should be recognized for tax purposes, or whether the covenant is a nonseverable part of the goodwill transferred so that the allocation to the covenant should be ignored.
Petitioner has the burden of proving that respondent's determination regarding the amount allocable to the covenant is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Peterson Machine Tool, Inc. v. Commissioner,79 T.C. 72 (1982), on appeal (10th Cir., Dec. 6, 1982); Wilmot Fleming Engineering Co. v. Commissioner,65 T.C. 847, 859 n. 19 (1976); Rule 142(a). [9]
The allocation to the covenant not to compete is important from a tax standpoint to both the buyer and the seller. This is so because the amount a buyer pays a seller for such a convenant, entered into in *682 connection with the sale of a business, is ordinary income to the covenantor and an amortizable item for the covenantee. Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858; Balthorpe v. Commissioner,356 F.2d 28 (5th Cir. 1966), affg. a Memorandum Opinion of this Court; section 1.167(a)-3, Income Tax Regs.Where there is no covenant not to compete, the sale of an entire business generally results in capital gain to the seller, with no amount amortized by the buyer. Because it represents remuneration resulting from an agreement not to perform services, any ordinary income received by BGF attributable to the covenant not to compete which is separately bargained for and clearly severable from the goodwill of the business is not excludable from income under the provisions of section 337. [10] The amount allocated to the covenant would therefore be includable in BGF's taxable income in the year of receipt. *683 We are confronted with the situation where one party to a contract is attempting to show that a different value should be placed on convenant not to compete than that value specified in the contract.Here the contract between Klimke and petitioner allocates $24,000 to equipment and fixtures, $500 each to trade name and goodwill, $44,000 to inventory, and $80,000 to a convenant not to compete. Petitioner contends that we should ignore the allocation in the purchase agreement because it is artificial and does not represent the actual substance of the transaction. He contends that the covenant was not treated as a separate aspect of the sale, nor, when considered in light of all the circumstances, that it had any realistic business implications for Federal tax purposes. Respondent contends that the facts require a contrary holding, that petitioner has not presented the "strong proof" necessary to overturn the allocation made by the parties to the covenant not to compete; that the allocation passes the "economic reality" test and that the covenant was separately bargained for and had an independent basis in fact along with a compelling relationship with business reality. We hold for *684 respondent on this issue. Although petitioner ordinarily has the burden of proving that respondent's determinations are incorrect by a preponderance of the evidence, here there is a stricter standard to be met before we will overturn the allocation made in the purchase agreement. Respondent again urges us to adopt the rule set forth in Commissioner v. Danielson,supra. The so-called Danielson rule states that to successfully set aside the value set in the contract, the party attacking the writing must present "proof which in an action between the parties to the agreement would be admissible to * * * show its unenforceability because of mistake, undue influence, fraud, duress, etc." 378 F.2d at 775. This Court has rejected use of the Danielson rule. Schmitz v. Commissioner,51 T.C. 306 (1968), affd. sub nom Throndson v. Commissioner,457 F.2d 1022 (9th Cir. 1972). Instead, we have adopted the "strong proof" rule as set out in Ullman v. Commissioner,264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957): *685 when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. See Peterson Machine Tool, Inc. v. Commissioner,supra;Major v. Commissioner,76 T.C. 239 (1981); Lucas v. Commissioner,58 T.C. 1022 (1972). Two tests have been used by the courts to determine whether the substantive elements of a transaction will allow a treatment different from the written contract.[11] The first, known as the "economic reality" test, was set forth in Schulz v. Commissioner,294 F.2d 52 (9th Cir. 1961), affg. 34 T.C. 235 (1960), as follows: the covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable man, genuinely concerned with their economic future, might bargain for such an agreement. [294 F.2d at 55.] Thus, where an agreement has been reached freely by both parties with an understanding of the implications thereof, courts are reluctant to go beyond the terms *686 of the agreement. Levinson v. Commissioner,45 T.C. 380 (1966). The second is the "severability" test. Under this test, the Court determines whether the covenant can be segregated from the rest of the agreement, that is, has been dealt with as a separate item. If the covenant is separated from the other assets transferred and was reasonably bargained for so that the consideration received therefore is actually severable, then that consideration will be ordinary income. The "severability" test first gained general acceptance after adoption by the Tenth Circuit, *687 to which an appeal in this case would normally lie, in Hamlin's Trust v. Commissioner,209 F.2d 761 (10th Cir. 1954), affg. Hamlin Trust v. Commissioner,19 T.C. 718 (1953). In view of our opinion in Golsen v. Commissioner,54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we will apply the "severability" test here, although we think the same result is achieved under either test. The Ullman rule applies to either test so that strong proof will be required to overcome the written provisions of the agreement. See and compare Main Brothers Oil Company, Inc. v. Commissioner,T.C. Memo. 1982-279. Petitioner contends the following: The first time he saw the covenant not to compete was in a meeting with Klimke to review the purchase agreement; the agreement was signed by him without any significant negotiations as to the covenant; and prior to the preparation of the purchase agreement, both parties had agreed upon a purchase price for certain assets of BGF without regard to a noncompetition provision and Klimke only thought of adding the provision after talking with his friend. Therefore, *688 petitioner concludes, the "severability" test was not met because the parties did not treat the covenant as a separate and distinguishable item in their negotiations and Klimke did not actually pay anything for the covenant as a separate item in the deal. We disagree. First, we think that meaningful negotiations did take place. While it is uncontested that the time spent discussing the ramifications of the covenant was short before the affixing of signatures, we are not certain petitioner was unaware of what the covenant meant. [12] Petitioner's contention that he thought the $80,000 allocated to the covenant was for "blue sky" (his nomenclature for goodwill) is suspect. The covenant was worded clearly and petitioner admits he considered that the covenant addressed competition. That petitioner understood the business ramifications of the covenant is also supported by the fact that the term "goodwill" was included in the purchase agreement with a specific amount allocated to it. Logically, petitioner may or may not have known what the term "goodwill" meant. If he knew what "goodwill" meant, then why did he not request that the $80,000 be included under the label "goodwill? *689 " It would be illogical to insist, as Klimke did, that an allocation be made a certain way if the two terms referred to the same item. If petitioner did not know what the term "goodwill" meant, then why did he only question the meaning of the term "covenant not to compete" rather than all unfamiliar terms when he examined the purchase agreement? It can reasonably be concluded that the covenant was a term he considered, examined, and understood. Petitioner simply has not shown by strong proof that he did not make a voluntary, willing, and knowing choice to allocate to the covenant the amount that was present in the purchase agreement. [13]
*690 Second, the fact that petitioner may not have comprehended the tax consequences of allocating an amount to the covenant, or that little time was spent in negotiations prior to signing, does not serve to nullify the parties' agreement. [14] The parties understood the purchase agreement and voluntarily entered into it. The law in such cases was clearly laid down in Hamlin's Trust v. Commissioner,supra, where the Court said: It is true that there was very little discussion of the suggested allocation. But the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it. * * * It is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision, but where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. While acting at arm's length and understandingly, the taxpayers agreed without condition or qualification that the money received should be on the basis of [the allocation in *691 the sale contract].Having thus agreed, the taxpayers are not at liberty to say that such was not the substance and reality of the transaction. [209 F.2d at 765.] The facts in the instant case are strikingly similar to those in Hamlin's Trust. Petitioner was aware of the allocation to the covenant not to compete when he signed the purchase agreement, and understood the covenant's terms. The fact that his haste to close the deal led him to sign the agreement [15] without retaining legal counsel who may have informed petitioner of the negative tax consequences is not controlling. The failure of petitioner to realize that the amount paid for the covenant would be treated as ordinary income to him is perhaps unfortunate, but that does not allow us to rewrite the agreement. To permit a unilateral reformation on behalf of petitioner would encourage litigation by parties seeking to undo undesirable *692 transactions after they have been completed and relied upon. This is contrary to one of the reasons for employing the "strong proof" rule. See Schulz v. Commissioner,294 F.2d 52, 54 (9th Cir. 1961), affg. 34 T.C. 235 (1960); Major v. Commissioner,76 T.C. 239, 247-248 (1981); Lazisky v. Commissioner,72 T.C. 495, 501-502 (1979) affd. sub nom. Magnolia Surf, Inc. v. Commissioner,636 F.2d 11 (1st Cir. 1980); Lucas v. Commissioner,58 T.C. 1022, 1036 (1972). We therefore decline to do it. Petitioner's argument that prior to Klimke's causing the purchase agreement to be prepared, he and Klimke had agreed to a purchase price for the assets of BGF without regard to or mention of a noncompetition provision does not necessarily indicate that the covenant was not a *693 separate item severable from the goodwill of the business. No discussions regarding how the price was to be "broken down" occurred before the presentation of the purchase agreement.In light of the fact that both parties reviewed the contract, questioned terms, and signed the contract voluntarily at arm's length, one cannot say the covenant not to compete was not a separate item that was actually dealt with. [16] Though introduced late into the negotiations, the fact that the allocation to the various assets was made subsequent to an agreed total sales price does not alter the allocation's efficacy. Maseeh v. Commissioner,52 T.C. 18, 22-24 (1969); Rudie v. Commissioner,49 T.C. 131, 139 (1967). *694 Petitioner relies heavily on our opinions in Shleppey v. Commissioner,T.C. Memo. 1963-165, and Skinner v. Commissioner,T.C. Memo. 1968-138, to support a contrary result. However, the facts in Shleppey match the instant case only to the point where the taxpayer in Shleppey noticed the covenant not to compete in his contract of sale. In Shleppey, unlike the instant case, the buyer then told the seller that the covenant would not hurt the seller in any way, and that, in fact, it would be of some benefit to him. We think the Shleppey case is distinguishable on this point. In the present case, there is no evidence of deceit or misrepresentation on the part of Klimke. Klimke made no statements or actions upon which petitioner, to his detriment, could reasonably rely. Further, Klimke informed petitioner that tax considerations were involved. We think a reasonable man would be put on guard by such a statement. Therefore, the element of reliance involved in our opinion in Shleppey is lacking in this case. See and compare M. Weingold & Co. v. Commissioner,T.C. Memo. 1977-73. Our opinion in Skinner is *695 also of no help to petitioner. There, one of the parties' lawyers placed the allocation into the agreement. The agreement was signed by the parties without knowledge of the presence of an allocation and without any mention of an allocation ever being made.Both parties learned of the existence of an allocation only after the contract had been signed. We think that case is clearly distinguishable from the present one where both parties discussed the allocation clause prior to executing the contract. For the reasons stated above, we hold that the covenant was a separate item reasonably bargained for. Therefore the "severability" test has been satisfied. Petitioner further contends that the allocation to the covenant is "artificial," a "tax gimmick" and a "sham." In support, he claims that the $80,000 amount allocated is excessively high in comparison to the total purchase price. [17] Klimke, of course, had a great interest in the allocation because of the anticipated benefits of amortizing the covenant. But we think this is acceptable inasmuch as his primary reason for requiring the covenant was to protect his new business. We think the amount accorded the covenant had an arguable *696 relationship with economic reality. See and compare Levinson v. Commissioner,45 T.C. 380 (1966) (covenant allocating $142,000 of $147,000 purchase price upheld); M. Weingold & Co. v. Commissioner,T.C. Memo. 1977-73 (62 1/2 percent of purchase-price allocation upheld). If we hold that the amount allocated to the covenant in the agreement is proper, petitioner claims, in the alternative, that because the term of the covenant is not absolute, it has no efficacy for Federal income tax purposes under the case of Burnet v. Logan,283 U.S. 404 (1931); or, because the covenant had no ascertainable value, following the liquidation under section 337, gain should be recognized only after payments exceed basis (citing Lentz v. Commissioner,28 T.C. 1157)). These claims are without merit. There is no requirement that the covenant be "absolute." The fact that Klimke could release petitioner from his obligations by a signed writing does not render the covenant "contingent" as contemplated in Burnet v. Logan. Here money was actually paid and *697 the transaction closed. The Lentz case addressed rights distributed in-kind on liquidation of a corporation which rights had no ascertainable fair market value. That case is readily distinguishable from this case where the parties have assigned a specific value comporting with economic reality.
Accordingly, we hold that petitioner has failed to present the "strong proof" required to overcome the allocations made in the purchase agreement and bill of sale. The $80,000 allocated to the covenant not to compete is therefore ordinary income to BGF, includable in its fiscal year 1978. The final issue presented is whether petitioner is liable for the addition to tax under section 6653(a) resulting from negligence or intentional disregard of respondent's rules and regulations. Petitioner has the burden of proving that respondent's determination of the addition to tax is incorrect. Pritchett v. Commissioner,63 T.C. 149, 174 (1974); Enoch v. Commissioner,57 T.C. 781 (1972). We think the petitioner has done so. He relied in good faith upon his accountant, *698 who was knowledgeable in tax matters. The accountant prepared the return, informed petitioner of his decision to treat the covenant as goodwill, and gave his reasons therefor. Those reasons, while incorrect, presented a plausible and arguable basis to support petitioner's claims. Accordingly, we hold that the petitioner is not liable for the section 6653(a) addition to tax. To give effect to the conclusions reached herein, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references shall be to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Respondent also determined in the notice of deficiency that: (3) BGF recognized ordinary gain from the disposition of certain assets subject to the provisions of section 1245; and (4) BGF is not entitled to section 172 net operating loss carryback deductions with respect to the taxable years ended February 28, 1975 and February 29, 1976. Petitioner has the burden of proving respondent's determinations are incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.↩ Petitioner did not address nor did he present any evidence concerning these determinations. As such, he has failed to meet his burden. However, because the outcome of issue 4 depends upon the resolution of issue 1, if we hold for respondent on the first issue, we necessarily hold for him as to issue 4 as well. As the resolution of issue 3 is independent of our other holdings, we sustain respondent's determination regarding this issue.
3. The covenant not to compete read as follows: 16.Covenant Not to Compete. From and after the date of transfer of possession, Seller and Shareholder Fred A. Feller shall not, without the express written authorization of Buyer, in any manner, compete directly or indirectly, either as manager, director, owner, employee, stockholder, volunteer, participant or otherwise, with the Buyer in the business of selling liquor at retail for a period of five (5) years within a radius of four (4) miles of [Green Mountain Liquors].
Seller and Shareholder acknowledge that should Seller or the Shareholder breach the terms of the previous paragraph, the remedy at law for any such breach by either of them will be inadequate, and that Buyer shall be entitled to injunctive relief. Should it be held that Buyer is not entitled to injunctive relief, Buyer shall be entitled to liquidated damages in the amount of One Hundred Thousand Dollars ($100,000) for the breach of any of the aforementioned covenants made by Seller and the Shareholder.↩
4. A physical bill of sale was necessary in order to process Klimke's application for a liquor license to operate the store. The successful granting of the license was a prerequisite to the closing of the sale.↩
5. The amended covenant not to compete reads as follows: Shareholder's wife owns and operates, either individually or by her son, the Union Liquors at [a location 1 mile from Green Mountain Liquors]. Shareholder may operate or be employed by Union Liquors not to exceed twenty-one (21) days in any calendar year either consecutively or a day at a time, or in combination thereof, provided that during the last three months of one year and the first three months of the next year he may not operate or be employed for more than twenty-one days in any three consecutive month period. ↩
6. Because only financing arrangements were addressed rather than price, no mention of the purchase price or its proper allocation was contained in the closing statement.↩
7. SEC. 6901. TRANSFERRED ASSETS.
(a) METHOD OF COLLECTION.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) INCOME, ESTATE, AND GIFT TAXES.-- (A) TRANSFEREES.--The liability, at law or in equity, of a transferee of property-- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * * ↩
8. As BGF was organized, operated, and dissolved in Colorado, we must look to Colorado law. Under Colorado law, conveyances: made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts, or demands, * * * shall be void. [Section 38-10-117, Colo. Rev. Stat. (1973)]. Colorado case law holds that any transfer by which a debtor becomes insolvent through the dissipation of his assets is fraudulent, rendering the transferee thereof a trustee liable for the debtor's obligations to the extent of the assets he receives. Steinbaugh v. Barday,143 Colo. 133, 352 P.2d 276 (1960). This "trust fund" principle would apply to corporate liquidations. See Sanders v. Commissioner,T.C. Memo. 1973-75; Commercial Finance Co. v. Commissioner,T.C. Memo. 1968-229.
All assets of BGF were distributed to petitioner upon BGF's dissolution. Also, petitioner did not contest that he is BGF's transferee. Thus, under Colorado law, petitioner is liable for any deficiencies and additions to tax with respect to BGF.↩
9. Unless otherwise indicated all references to "rules" shall be to the Tax Court Rules of Practice and Procedure.↩
10. Harvey Radio Laboratories, Inc. v. Commissioner,470 F.2d 118 (1st Cir. 1972), affg. a Memorandum Opinion of this Court; Dodson v. Commissioner,52 T.C. 544, 554-555 (1969). See and compare MacDonald v. Commissioner,T.C. Memo. 1982-270. See also Rev. Rul. 74-29, 1974-1 C.B. 79↩.
11. For tax matters, it is well settled that the substance of a transaction rather than the mere form used to transfer legal title will govern. Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Higgins v. Smith,308 U.S. 473 (1940); Hamlin's Trust v. Commissioner,209 F.2d 761 (10th Cir. 1954), affg. Hamlin Trust v. Commissioner,19 T.C. 718 (1953), Foster v. Commissioner,80 T.C. No. 34, 201, 208 n. 109 (1983)↩.
12. Petitioner testified on direct examination as follows: Q: What if any discussion did you have with Mr. Klimke about the covenant not to compete on May 17th? A: I questioned the amount and he said the covenant not to compete is a privilege for tax write off. At that point, I admired him because he knew more about tax business than I did. Q: What did you think was meant by a convenant not to compete as set forth in the purchase agreement? A: I assumed it was blue sky or if it was competition, @mr. Klimke would not have had to worry because we were committed to a ranch. Q: (D)escribe what you believed you were selling (to) Mr. Klimke. A: Fixtures, equipment, blue sky, and the inventory. [Emphasis supplied.] ↩
13. Other facts which lead us to question petitioner's contention that he was unaware of what the term "covenant not to compete" meant include: (1) He questioned the amount↩ of the covenant in his discussions rather than the term itself; (2) we are skeptical of the accuracy of his testimony that he had previously acquired and sold a substantial number of competitive businesses, but had never seen a covenant not to compete; and (3) the covenant was substantially altered by the supplemental purchase agreement which indicates a comprehension of the provision's ramifications.
14. Petitioner contends that since the covenant was not discussed at length in the negotiations, the allocation fails the "severability" test because the covenant was never actually dealt with, never bargained for, and never evaluated as a separate item in the transaction.↩
15. On Cross-examination, petitioner stated the following: Q: Were there any reasons why you would not have discussed (the covenant) further with Mr. Klimke? A: The only thing that mattered to me was the dollars, go out to the ranch and move in. I didn't worry at that point where he put the amount on paper.↩
16. Petitioner asserts that business realities point to a determination that Klimke would not have bargained for a covenant not to compete since Klimke was fully aware of both petitioner's intention to move away from Lakewood and with petitioner's lack of any interest whatsoever to compete with Klimke. We disagree. It is clear that the parties intended to allocate a certain value to the covenant despite petitioner's present claim. Petitioner may have thought little of the covenant at selling time because of his future intentions, but this is not controlling. Klimke did not share petitioner's lack of concern. Circumstances change, and with that the prospect of certainty in the future rapidly diminishes. We are convinced that Klimke accorded great weight to the covenant. He had never purchased any business before, was making a great change in his life, and was therefore understandably hesitant to structure the deal in any way out of the ordinary. He credibly testified at trial that, once enlightened by his liquor-store-owing friend, the covenant became essential. Petitioner was well known in the community, had owned another business in the same shopping center where Green Mountain Liquors was located, and still owned other businesses in the area. Consequently, petitioner's competition posed a substantial threat to the goodwill of the business Klimke was purchasing. At the time of the purchase, petitioner was not of retirement age (he was 51) and his wife still owned Union Liquors. That petitioner thought this of no moment does not indicate that the parties did not intend such a covenant to have a certain value, but only what that value would be. That some value was accorded the covenant is borne out by the fact that petitioner successfully sought to significantly amend the covenant's terms before the closing of the sale.↩
17. The allocation equaled approximately 53% of the purchase price.↩